<u>**ORAL ARGUMENT NOT YET SCHEDULED**</u>

<u>**IN THE UNITED STATES COURT OF APPEALS**</u>
<u>**FOR THE DISTRICT OF COLUMBIA CIRCUIT**</u>

No. 25-1275

---

ENVIRONMENTAL DEFENSE FUND, *et al.,*
*Petitioners,*

v.

LEE ZELDIN, *et al.,*
*Respondents.*

---

Petition for Review of Final Action of the
United States Environmental Protection Agency

---

**PETITIONERS' OPENING BRIEF**

| | |
|---|---|
| Grace M. Smith | Alexandra O. Schluntz |
| Rosalie Winn | Robin Cooley |
| Environmental Defense Fund | Earthjustice |
| 2060 Broadway, Ste. 300 | 1125 17th Street #1010 |
| Boulder, CO 80302 | Denver, CO 80202 |
| (303) 447-7560 | (303) 996-9612 |
| gsmith@edf.org | aschluntz@earthjustice.org |
| rwinn@edf.org | rcooley@earthjustice.org |
| | |
| *Counsel for Environmental Defense Fund* | *Counsel for Clean Air Council, Dakota Resource Council, Food & Water Watch, Fort Berthold Protectors of Water & Earth Rights, and GreenLatinos* |

Additional counsel are listed on the signature block.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Petitioners hereby certify as follows:

## I. Parties and *Amici*

Petitioners: Petitioners in this case are Environmental Defense Fund, Clean Air Council, Center for Biological Diversity, Dakota Resource Council, Earthworks, Environmental Law & Policy Center, Food & Water Watch, Fort Berthold Protectors of Water & Earth Rights, GreenLatinos, Natural Resources Defense Council, and Sierra Club.

Respondents: Respondents in this case are the United States Environmental Protection Agency ("EPA") and Lee Zeldin, in his official capacity as Administrator of the EPA.

Intervenors: Intervenors in this case are American Exploration & Production Council, American Petroleum Institute, Arizona Legislature, Arkansas Producer Associations and Royalty Owners, Commonwealth of Virginia, Domestic Energy Producers Alliance, Eastern Kansas Oil & Gas Association, Gas and Oil Association of WV, GPA Midstream Association, Illinois Oil & Gas Association, Independent Petroleum Association of America, Indiana Oil and Gas Association, International Association of Drilling Contractors, Interstate Natural Gas Association of America, Kansas Independent Oil & Gas Association, Kentucky Oil and Gas Association, Michigan Oil and Gas

Association, National Stripper Well Association, North Dakota Petroleum Council, Ohio Oil and Gas Association, Pennsylvania Independent Oil & Gas Association, Petroleum Alliance of Oklahoma, State of Alabama, State of Alaska, State of Arkansas, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, State of Kentucky, State of Missouri, State of Montana, State of Nebraska, State of North Dakota, State of Ohio, State of Oklahoma, State of South Carolina, State of Texas, State of West Virginia, State of Wyoming, Texas Alliance of Energy Producers, Texas Producer Associations & Royalty Owners Association, Western Energy Alliance

<u>Amici Curiae:</u> None at present.

## II.  Ruling Under Review

Petitioners challenge EPA's final action *Oil and Natural Gas Sector Climate Review: Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources*, 90 Fed. Reg. 55671 (Dec. 3, 2025) ("Delay Rule").

## III.  Related Cases

*Environmental Defense Fund, et al. v. Zeldin*, Nos. 25-1164 and 25-1168 (challenges to prior interim final rule delaying same regulations, dismissed as moot in light of adoption of rule challenged in this case).

**RULE 26.1 DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure and D.C. Circuit Rule 26.1, Movants Environmental Defense Fund, Clean Air Council, Center for Biological Diversity, Dakota Resource Council, Earthworks, Environmental Law & Policy Center, Food & Water Watch, Fort Berthold Protectors of Water & Earth Rights, GreenLatinos, Natural Resources Defense Council, and Sierra Club state that they are non-profit environmental organizations without any parent corporation or stock.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..... i

RULE 26.1 DISCLOSURE STATEMENT .................................................. iii

TABLE OF CONTENTS.................................................................... iv

TABLE OF AUTHORITIES ............................................................. vi

GLOSSARY ................................................................................ ix

INTRODUCTION ...........................................................................1

JURISDICTIONAL STATEMENT ........................................................3

STATUTES AND REGULATIONS .......................................................3

STATEMENT OF ISSUES ................................................................3

STATEMENT OF THE CASE ............................................................4

    I.   Legal Background: Clean Air Act Sections 111 and 307(d)(7)(B). ......4

    II.   Regulatory Background. .........................................................5

       A.   The 2024 Rule. ................................................................5

       B.   EPA's Reconsideration of the 2024 Rule.................................9

       C.   EPA's Interim Final Rule Suspending Compliance Deadlines.....10

       D.   EPA's Delay Rule Affirming the Interim Final Rule....................12

SUMMARY OF ARGUMENT ...........................................................15

STANDING ..............................................................................16

STANDARD OF REVIEW ..............................................................20

ARGUMENT..............................................................................20

   I. EPA's Failure to Consider Emission Impacts of the Delay Rule Violates Section 111 and the Requirement for Reasoned Decision-Making.......20

       A.   EPA Failed to Consider Emissions Impacts in Violation of Section 111. ........................................................................21

       B.   EPA's Economic Impact Analysis Does Not Remedy the Delay Rule's Legal Deficiencies............................................................24

   II.  The Delay Rule Violates the Clean Air Act's Limitation on Stays Pending Reconsideration.........................................................29

   III. The Rule Is Arbitrary and Capricious Because EPA Failed to Provide Reasoned Justifications for the Extensions. .....................................33

A. Zero-Emitting Process Controllers. ..............................................35

B. Super Emitter Program. .............................................................38

C. Low-Emitting Valves. ................................................................41

D. Enclosed Combustion Devices: Performance Testing. ................43

E. Combustion Devices: Continuous Pilot Flames and Alarms. ......46

F. Storage Vessels: Thirty-Day Potential-to-Emit Calculation........48

G. Storage Vessels: Throughput-Based Modification Trigger. .........50

H. Legally and Practicably Enforceable Emission Limits. ...............51

I. Closed-Vent Systems. ................................................................53

J. Annual Compliance Report Deadline. .........................................56

K. State Plans. ...............................................................................57

CONCLUSION..................................................................................61

CERTIFICATE OF COMPLIANCE ...............................................63

CERTIFICATE OF SERVICE ..........................................................64

# TABLE OF AUTHORITIES

**CASES**

*Action on Smoking and Health v. CAB*, 699 F.2d 1209 (D.C. Cir. 1983).............38

*Affirmed Energy, LLC v. FERC*, 166 F.4th 1070 (D.C. Cir. 2026) ........................34

*\*Air All. Houston v. EPA*, 906 F.3d 1049 (D.C. Cir. 2018)... 5, 15, 29, 30, 31, 32, 33

*\*American Lung Association v. EPA*, 985 F.3d 914 (D.C. Cir. 2021) 2, 4, 15, 20, 21, 22, 23, 24, 28, 29, 59

*Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677 (D.C. Cir. 1984)..................................................................................34

*\*Clean Air Council v. Pruitt*, 862 F.3d 1 (D.C. Cir. 2017) .................................5, 23

*Clean Wisconsin v. EPA*, 964 F.3d 1145 (D.C. Cir. 2020) ......................................17

*Comcast Corp. v. FCC*, 579 F.3d 1 (D.C. Cir. 2009)................................................60

*Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172 (9th Cir. 2008) .................25

*Env't Def. Fund v. EPA*, 716 F.2d 915 (D.C. Cir. 1983)..........................................23

*\*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).... 20, 28, 33, 36, 44, 53

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ...........................................................................................................................19

*Genuine Parts Co. v. EPA*, 890 F.3d 304 (D.C. Cir. 2018) .....................................46

*Healthy Gulf v. Dep't of Interior*, 152 F.4th 180 (D.C. Cir. 2025)..........................17

*In re NTE Conn., LLC*, 26 F.4th 980 (D.C. Cir. 2022)............................... 43, 51, 60

*McGregor Printing Corp. v. Kemp*, 20 F.3d 1188 (D.C. Cir. 1994) ................. 49, 55

*\*Michigan v. EPA*, 576 U.S. 743 (2015) ...................................................... 20, 24, 25

*Montana v. Haaland*, 50 F.4th 1254 (9th Cir. 2022)................................................25

*\*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ......................................................................... 20, 28, 33, 41, 54, 56

*Nat. Res. Def. Council v. EPA*, 755 F.3d 1010 (D.C. Cir. 2014)....................... 18, 19

*Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68 (D.C. Cir. 2020) ............................19

*Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102 (D.C. Cir. 2019)...................................38

*NetCoalition v. SEC*, 615 F.3d 525 (D.C. Cir. 2010) .................................. 37, 45, 49

*NRDC v. Reilly*, 976 F.2d 36 (D.C. Cir. 1992).......................................................30

*Orchard Hill Bldg. Co. v. Army Corps of Eng'rs*, 893 F.3d 1017 (7th Cir. 2018)...47

*Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92 (2015) ...........................................36

*Sierra Club v. Costle*, 657 F.2d 298 (D.C. Cir. 1981)................................................4

*Sierra Club v. EPA*, 863 F.3d 834 (D.C. Cir. 2017) ......................................... 34, 38

*Sinclair Wyo. Refining Co. v. EPA*, 114 F.4th 693 (D.C. Cir. 2024) ........... 33, 34, 39

*Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506 (D.C. Cir. 1983)

........................................................................................................................ 47, 59

*Sorenson Comm'ns Inc. v. FCC*, 755 F.3d 702 (D.C. Cir. 2014)............................40

*Susquehanna Int'l Grp. v. SEC*, 866 F.3d 442 (D.C. Cir. 2017).......... 34, 45, 47, 53

*United Tech. Corp. v. U.S. Dep't of Defense*, 601 F.3d 557 (D.C. Cir. 2010)..........48

**STATUTES**

42 U.S.C. § 7411 ............................................................................. 3, 5, 26

42 U.S.C. § 7411(b) ...............................................................................4

42 U.S.C. § 7411(d) ...............................................................................4

42 U.S.C. § 7607(b)(1).............................................................................3

42 U.S.C. § 7607(d) ............................................................................3, 20

**RULES**

86 Fed. Reg. 63110 (Nov. 15, 2021)................................................. 1, 2, 6

87 Fed. Reg. 74702 (Dec. 6, 2022)................................................. 7, 8, 58

89 Fed. Reg. 16821 (Mar. 8, 2024)......................................... 2, 5, 8, 27, 57

90 Fed. Reg. 35966 (July 31, 2025).... .10, 11, 16, 22, 30, 31, 32, 36, 39, 40, 41, 42, 43, 46, 47, 48, 50, 51, 52, 59, 60

90 Fed. Reg. 3734 (Jan. 15, 2025) ...........................................................................9

90 Fed. Reg. 8353 (Jan. 20, 2025) ...........................................................................9

90 Fed. Reg. 55671 (Dec. 3, 2025)..... .12, 14, 21, 22, 23, 32, 34, 35, 36, 42, 45, 48, 52, 53, 54, 55, 56, 57, 59

91 Fed. Reg. 18056 (Apr. 9, 2026) .......................................................................9

*Authorities chiefly relied upon are marked with an asterisk.

# GLOSSARY

| | |
|---|---|
| 2024 Rule | EPA, *Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review*, 89 Fed. Reg. 16821 (Mar. 8, 2024) |
| Delay Rule | EPA, *Oil and Natural Gas Sector Climate Review: Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources*, 90 Fed. Reg. 55671 (Dec. 3, 2025) |
| EPA | United States Environmental Protection Agency |
| Interim Final Rule | EPA, *Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review Final Rule*, 90 Fed. Reg. 35966 (July 31, 2025) |
| Memorandum | EPA, Memorandum to Docket, Economic Impact Analysis (July 23, 2025) |
| RTC | Response to Comments |

# INTRODUCTION

The Environmental Protection Agency ("EPA" or "Agency") spent years crafting cost-effective standards to provide critical public health and climate protections against pollution from the oil and gas industry. Then, in a matter of months as part of its stated intent to pursue the "biggest deregulatory action in U.S. history," EPA reversed course in an action to substantially delay compliance with those standards. Petitioners challenge that delay as a violation of the Clean Air Act devoid of reasoned decision-making.

In March 2024, EPA fulfilled its obligation under section 111 of the Clean Air Act, 42 U.S.C. § 7411, to promulgate standards to reduce methane and other air pollution from the oil and gas sector. Natural gas is composed mostly of methane, along with smog- and soot-forming volatile organic compounds and cancer-causing hazardous air pollutants. Anytime gas is leaked or intentionally vented from oil and gas facilities, these pollutants are emitted into the air.

Cumulatively, these releases have made the oil and gas industry "by far, the largest methane-emitting industry in the nation." 86 Fed. Reg. 63110, 63147 (Nov. 15, 2021). Methane is an extremely potent greenhouse gas: it is more than eighty times more powerful than carbon dioxide at trapping heat in the atmosphere and is responsible for one-third of the warming—and the cascading climate impacts—occurring today. *Id.* at 63113-14. EPA calculated that the 2024 Rule

1

would cut emissions of 58 million tons of methane, 16 million tons of volatile organic compounds, and 590,000 tons of hazardous air pollutants over the next 15 years. 89 Fed. Reg. 16821, 17017 (Mar. 8, 2024).

In March 2025, just one year after finalizing the 2024 Rule, EPA abruptly changed direction, announcing plans to initiate a wholesale reconsideration of the 2024 Rule as part of the Trump Administration's larger efforts to weaken health and environmental protections. Although many of the standards had been in effect for more than a year, EPA adopted an Interim Final Rule in July 2025 that immediately suspended many of the compliance obligations established in the 2024 Rule. As EPA Administrator Lee Zeldin later confirmed, the Agency suspended those deadlines to buy time to conduct its planned reconsideration. EPA then reaffirmed the Interim Final Rule in December 2025 with the nearly identical final Delay Rule challenged here.

EPA promulgated the Delay Rule without regard for the public health and welfare impacts of the delays, ignoring a core purpose of section 111 and violating this Court's binding precedent in *American Lung Association v. EPA*, 985 F.3d 914 (D.C. Cir. 2021), *rev'd and remanded on other grounds sub nom. West Virginia v. EPA*, 597 U.S. 697 (2022). The Agency also unlawfully skirted the Clean Air Act's strict three-month limit on stays pending reconsideration. And in its haste, EPA

failed to provide factual support and a rational basis for the delays, falling far short of the Act's standards for reasoned decision-making.

The Delay Rule must be vacated.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1), to review this timely challenge to EPA's final action of the Delay Rule.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in an addendum to this brief.

## STATEMENT OF ISSUES

1. Whether EPA's failure to consider the health and environmental impacts of the Delay Rule violated Clean Air Act sections 111 and 307(d)(9), 42 U.S.C. §§ 7411, 7607(d)(9).

2. Whether EPA unlawfully circumvented the express limitations on stays pending reconsideration set forth in Clean Air Act section 307(d)(7)(B), 42 U.S.C. § 7607(d)(7)(B).

3. Whether EPA arbitrarily and capriciously extended deadlines without a reasoned justification for each extension.

**STATEMENT OF THE CASE**

**I.      Legal Background: Clean Air Act Sections 111 and 307(d)(7)(B).**

The "central purpose" of section 111 of the Clean Air Act is to prevent "harm [to] people and the environment." *Am. Lung Ass'n*, 985 F.3d at 993. To effectuate this purpose, section 111 directs EPA to list "categories of stationary sources" that it concludes "cause[], or contribute[] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7411(b)(1)(A). For each source category, EPA must prescribe federal "standards of performance" for new, modified, and reconstructed sources (essentially, sources built after the proposal of the rule) that reflect the "degree of emission limitation achievable" through application of the "best system of emission reduction," taking into account factors such as costs, energy requirements, and the quantity of pollution abated. *Id.* §§ 7411(a)(1), (b)(1)(B); *see also Sierra Club v. Costle*, 657 F.2d 298, 326 (D.C. Cir. 1981). For pollutants such as methane that are not regulated under certain other Clean Air Act provisions, the Agency must also issue emission guidelines for existing sources, requirements that are implemented through state plans submitted to and subject to approval by EPA. 42 U.S.C. § 7411(d).

Once the EPA has adopted section 111 standards, the Clean Air Act provides only two paths for the Agency to alter compliance obligations. First, if parties

demonstrate to EPA that they lacked an opportunity to comment on an issue of central relevance to the rule, EPA must grant administrative reconsideration pursuant to section 307(d)(7)(B)—and may opt to stay the rule's effectiveness for a maximum of three months. *Id.* § 7607(d)(7)(B); *see also Air All. Houston v. EPA*, 906 F.3d 1049, 1054 (D.C. Cir. 2018).

Second, EPA may revise section 111 standards, including compliance deadlines, by invoking the Act's standard rulemaking process and abiding by the Act's accompanying requirements. 42 U.S.C. §§ 7411, 7607(d); *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) (EPA's delay of section 111 oil and gas methane rule compliance dates was "tantamount to amending or revoking a rule"). EPA has no authority to suspend or delay a currently effective rule apart from these two paths.

## II.    Regulatory Background.

### A.    The 2024 Rule.

On March 8, 2024, EPA promulgated a rule strengthening the oil and gas source category's new source standards for methane and volatile organic compounds. 89 Fed. Reg. 16821, 16826-27 (Mar. 8, 2024) ("2024 Rule"). In addition, for the first time, EPA met its mandatory duty to establish emission guidelines for state plans to limit methane from existing oil and gas facilities, which constitute the "vast majority of polluting sources." *Id.* at 16826-27; 86 Fed.

Reg. at 63150, 63152. In the 2024 Rule, EPA established standards consisting of emission limitations, compliance assurance measures, and compliance deadlines for each type of covered equipment in the category. 89 Fed. Reg. at 16871-16902.

The 2024 Rule reflected EPA's careful consideration of and response to nearly one million comments. Over the course of two years, the Agency determined the best system of emission reduction for various pollution sources across the sector, considering compliance feasibility and cost. *See id*. at 16824; *see also* JA_____[EPA-HQ-OAR-2021-0317-4009] (Response to Public Comments on the November 2021 Proposed Rule and the December 2022 Supplemental Proposed Rule (Nov. 2023)) ("2024 RTC"). The compliance deadline for almost all new source standards was May 7, 2024, although EPA gave operators an additional year to comply with the process controller standard, with a deadline of May 7, 2025. 89 Fed. Reg. at 16820, 17048. The Agency also established a state plan submittal deadline of March 9, 2026, and allowed states to grant existing sources an additional three years (until 2029) to achieve full compliance with the standards in the final plans. *Id.* at 17141, 17011.

The purpose of the 2024 Rule was to carry out EPA's responsibility under section 111 to "mitigat[e] climate-destabilizing pollution and protect[] human health by reducing [greenhouse gas] and [volatile organic compound] emissions from the oil and natural gas industry." *Id.* at 16823; *see also id.* at 16826 ("EPA has

the unique responsibility and authority to regulate harmful air pollutants emitted by the Crude Oil and Natural Gas source category."). As such, the 2024 Rule contained an extensive discussion of the emission impacts of cancer-causing hazardous air pollutants and smog-forming volatile organic compounds from the oil and gas industry, *see, e.g.*, *id.* at 16841, and gave "careful consideration" to the benefits of reducing this pollution to communities living near oil and gas development. *Id.* at 17019-23. The 2024 Rule also extensively discussed the industry's contributions to climate change and recognized that a warming climate "endanger[s] the physical survival, health, economic well-being, and quality of life of people living in the United States…especially those in the most vulnerable communities." *Id.* at 16824, 16836-41.

In formulating each of the 2024 Rule's standards, including those that are now delayed, EPA extensively evaluated pollution sources, mitigation methods, and their associated environmental and health benefits. *See, e.g.*, 87 Fed. Reg. 74702, 74747 (Dec. 6, 2022) (recognizing super emitters' "significant impact" on communities); 89 Fed. Reg. at 16877 (creating program to address the "widespread problem of abnormally large emissions events"); *id.* at 16881 (citing need for process controller standards because those units "are a significant source of methane emissions"); 87 Fed. Reg. at 74793 (concluding that a minimum net heating value is required to ensure combustion devices adequately reduce

7

emissions); *id.* at 74804 (creating closed-vent system standards to "ensure that emissions are captured"). EPA also balanced the benefits of pollution reductions with industry's implementation concerns in setting substantive requirements and compliance timelines. *See, e.g.*, 89 Fed. Reg. at 17010.

In addition, EPA quantified the emission impacts of the 2024 Rule, estimating that between 2024 and 2038, the Rule would reduce methane, volatile organic compound, and hazardous air pollutant emissions by 58 million, 16 million, and 590,000 tons, respectively over the next 15 years. *Id.* at 17017. The Agency further calculated that the 2024 Rule would avoid approximately $110 billion in climate-related damages and $7 billion in other health-related damages between 2024 and 2038, *id.*, and determined that these benefits were more than five times the industry's net costs to implement the rule, *id.* at 16836, tbl. 6. EPA concluded that "based on the totality of circumstances, the advantages that the rule provides…outweigh its disadvantages, namely cost of industry compliance in the context of the industry's revenue and expenditures." *Id.* at 16868.

In April 2024, certain states and industry parties filed legal challenges to the 2024 Rule. This Court and the Supreme Court denied requests to stay the rule pending judicial review. Order, *Texas v. EPA*, No. 24-1054 (D.C. Cir. July 9, 2024) (Doc. 2063659); Order, *Oklahoma v. EPA*, 145 S.Ct. 121 (Oct. 4, 2024).

**B.      EPA's Reconsideration of the 2024 Rule.**

Between April and May 2024, EPA received several petitions for reconsideration requesting that the Agency revisit numerous aspects of the 2024 Rule that it had already addressed during the comment periods, including requests to alter the standards on the grounds of claimed cost and feasibility concerns.[1] In response, the Agency agreed to reconsider two narrow issues—exemptions for temporary flaring and requirements for the net heating value of control devices—and later finalized its limited reconsideration. 90 Fed. Reg. 3734 (Jan. 15, 2025); 91 Fed. Reg. 18056 (Apr. 9, 2026).

The potential scope of reconsideration widened dramatically, however, when the Trump Administration took office. On January 20, 2025, President Trump signed Executive Order 14154, "Unleashing American Energy," which (among other things) directed federal agencies to "review...those agency actions that impose an undue burden on the identification, development, or use of domestic energy resources." 90 Fed. Reg. 8353, 8354. In response, EPA announced in March 2025 what the Administrator's press release called the "Biggest Deregulatory

---

[1] *See, e.g.,* JA_____[EPA-HQ-OAR-2025-0162-0003] (GPA Petition (May 2, 2024)); JA_____[EPA-HQ-OAR-2025-0162-0007] (API/AXPC Petition (Apr. 5, 2024)); JA_____[EPA-HQ-OAR-2025-0162-0006] (ExxonMobil Petition (Apr. 26, 2024)); JA_____[EPA-HQ-OAR-2025-0162-0009] (TXOGA Petition (May 7, 2024)).

Action in U.S. History," targeting 31 regulations for revision or rescission—including the 2024 Rule.[2] Administrator Zeldin recently confirmed the Agency is actively reconsidering the 2024 Rule more broadly and that EPA is "about to announce" another phase of reconsideration.[3]

### C.  EPA's Interim Final Rule Suspending Compliance Deadlines.

Soon after EPA's March announcement, in July 2025, EPA adopted an Interim Final Rule that immediately suspended key compliance deadlines in the 2024 Rule as it continues its broad reconsideration. 90 Fed. Reg. 35966, 35969-70 (July 31, 2025). Administrator Zeldin testified to Congress that EPA delayed the deadlines "to allow [EPA] to fix…the flaws with the [2024 Rule]."[4]

Although by that point all the new-source deadlines had already passed (most over a year earlier), the Interim Final Rule extended many of them to January 22, 2027—extensions of up to almost three years from the original deadlines. These included deadline extensions for the Super Emitter Program, process controller standards, storage tank standards, leak-repair requirements, and

---

[2] EPA, *EPA Launches Biggest Deregulatory Action in U.S. History* (Mar. 12, 2025), https://perma.cc/F57N-B3QV; EPA, *Trump EPA Announces OOOO b/c Reconsideration of Biden-Harris Rules Strangling American Energy Producers* (Mar. 12, 2025), https://perma.cc/4XPZ-792G.
[3] *FY2027 EPA Budget: Hearing Before the Subcomm. on Env't of the H. Comm. on Energy & Commerce*, 119th Cong., at 1:07:48 (Apr. 28, 2026) (statement of Lee Zeldin, Adm'r, EPA), https://perma.cc/WMV7-44NP.
[4] *Id.*

compliance-assurance requirements for several types of emission control equipment, such as enclosed combustion devices, flares, and closed-vent systems. 90 Fed. Reg. at 35970-77. These delayed new-source standards address significant sources of emissions: for example, process controllers accounted for 65% of total methane emitted by onshore oil production in 2019, 89 Fed. Reg. at 16881, while the Super Emitter Program is intended to "comprehensively address[] the widespread problem of abnormally large emissions events," *id.* at 16877; *see also* ADD_263-66 ¶¶ 33-34 (Proville-Mirtich).

As for existing sources, the Interim Final Rule postponed the state plan submission deadline by ten months to January 22, 2027—effectively delaying all requirements for existing sources in the 2024 Rule. 90 Fed. Reg. at 35977-79.

Petitioners promptly sought review of the Interim Final Rule and filed a motion for summary vacatur. *Env't Defense Fund v. U.S. EPA*, Nos. 25-1164; 25-1168, Doc. 2130555 (D.C. Cir. Aug. 18, 2025). That motion and the petition for review were subsequently dismissed as moot. *Id.*, Doc. 2161664 (Mar. 2, 2026). Petitioners also filed detailed comments objecting to the Interim Final Rule's delays and rationales during EPA's post hoc comment period.[5]

---

[5] JA_____[EPA-HQ-OAR-2025-0162-0178] (EDF Comment (Oct. 2, 2025)).

**D.     EPA's Delay Rule Affirming the Interim Final Rule.**

On December 3, 2025, EPA published a final rule affirming the Interim Final Rule's delays. 90 Fed. Reg. 55671, 55674.[6] The Delay Rule also went further than the Interim Final Rule by extending the deadline for sources to submit annual compliance reports by 360 days for *all* standards (not just those subject to the Interim Final Rule). *Id.* at 55674. EPA asserted that the deadline extensions were "necessary" "[b]ased on information received in petitions for reconsideration." *Id.*

Neither the Interim Final Rule nor the Delay Rule made any mention of climate or health harms associated with the increased air pollution due to the delays. Nor did EPA attempt to quantify the forgone reductions or the resulting health and environmental impacts from delaying the 2024 Rule's new-source standards. *See* JA_____[EPA-HQ-OAR-2025-0162-0025_1] (Memorandum to Docket, Economic Impact Analysis (July 23, 2025)) ("Memorandum"); JA_____[EPA-HQ-OAR-2025-0162-0672] (Memorandum to Docket, Affirmation of Economic Impact Analysis (Oct. 31, 2025)).

As its sole effort to evaluate the Delay Rule's effects on pollution, EPA prepared a Memorandum containing a cursory "economic impact analysis" that

_____

[6] The Delay Rule "reaffirms the conclusions reached in the [Interim Final Rule]" and refers back to the "reasons stated in the [Interim Final Rule]." 90 Fed. Reg. at 55680, 55675. For this reason, Petitioners will reference both rules in this brief.

calculated the forgone emission reductions from delaying the existing source emission guidelines. JA_____-_____[Memorandum_5-8]. Notably, the Agency declared that the Memorandum "was not part of the EPA's decision-making and has no independent effect" because it was prepared solely for the Office of Management and Budget (OMB) pursuant to Executive Order 12866. JA_____[EPA-HQ-OAR-2025-0162-0673_31] (Response to Public Comments on the July 31, 2025 Interim Final Rule (Nov. 24, 2025)) ("RTC"). The Memorandum estimated the delay will result in emissions of 3.8 million tons of methane, 960,000 tons of smog-forming volatile organic compounds, and 36,000 tons of hazardous air pollutants that would have otherwise been eliminated in 2028. It also predicted an overall increase in emissions of 1.3 million tons of methane, 350,000 tons of volatile organic compounds, and 13,000 tons of hazardous air pollutants between 2028 and 2039.

Neither the Memorandum nor the Delay Rule included any discussion of the monetary climate or ozone pollution costs caused by the amended compliance dates, JA_____[Memorandum_10], despite EPA's previous calculation that the 2024 Rule would avoid billions of dollars in climate- and health-related damages. 89 Fed. Reg. at 16836.

In response to comments insisting that the Agency must consider factors including emission impacts, EPA stated that it "disagrees...that the [Rule] violated

any provision of [Clean Air Act] section 111" because "the specific changes are related to limited, targeted[] extensions." JA_____[RTC_27]; *see also id.* (asserting that compliance delays "are not a true change in agency policy"); 90 Fed. Reg. at 55674 (describing rule as limited to "compliance deadline issues" as opposed to "substantive amendments"). EPA did not respond to Petitioners' comment that under this Court's decision in *American Lung Association,* the Clean Air Act requires the Agency to weigh the public health and welfare impacts of any delay in compliance deadlines. *See* JA_____-_____[RTC_46-47]; *see also* 90 Fed. Reg. at 55679 (acknowledging comments that EPA "failed to adequately address the environmental and public health effects of the deadline extension" and stating only that "EPA disagrees with these comments"). Petitioners challenged the Delay Rule upon finalization and filed a motion for summary vacatur. Pet. for Review, Doc. 2149019;[7] Mot. for Summ. Vacatur, Doc. 2151923. The Court denied the Petitioners' motion, Order, Doc. 2161664 (Mar. 2, 2025), and merits briefing followed.

---

[7] The Court initially consolidated this petition and those challenging the Interim Final Rule, Order, Doc. 2149415 (Dec. 9, 2025), but terminated the consolidation upon dismissing the Interim Final Rule challenge, Order, Doc. 2161664 (Mar. 2, 2026).

**SUMMARY OF ARGUMENT**

The Delay Rule should be reversed because the EPA arbitrarily ignored the health and climate consequences of delaying Clean Air Act protections. EPA's refusal to consider the air pollution-reduction benefits forgone by delaying compliance with the 2024 Rule is a clear violation of the Act and this Court's binding precedent in *American Lung Association*. That case squarely holds that EPA must consider emission impacts when extending section 111 deadlines, since reducing pollution is "arguably the most important aspect" of the problem and "the central purpose" of the statute. 985 F.3d at 947, 993, 995.

The Delay Rule is also unlawful because it is subject to—and violates—the Clean Air Act's conditions on stays pending reconsideration, including the three-month limitation on such stays. 42 U.S.C. § 7607(d)(7)(B). EPA's Administrator publicly professed that the Delay Rule was intended to buy time to fix the 2024 Rule, and the record here confirms that intent. But "EPA cannot escape Congress's clear intent to specifically limit the agency's authority under Section [307] by grasping at its separate, more general authority" under section 111. *Air All. Houston*, 906 F.3d at 1061.

Finally, each of the Delay Rule's deadline extensions are independently arbitrary and capricious. EPA relied heavily on factual conclusions that the Agency previously considered and rejected in the 2024 Rule, yet EPA failed to adequately

15

explain its about-face. EPA's generalized assertions about feasibility and "timing difficulties" lack record support. 90 Fed. Reg. 35966. The Agency also repeatedly relied on communications that are not in the record, as well as unverified and self-serving assertions from regulated parties—all while ignoring contradictory information in the record.

For all these reasons, the Court should reverse the Delay Rule as arbitrary and capricious and contrary to law.

## STANDING

As set forth in detail in the attached declarations, Petitioners have standing to bring this action because their members and their families live, work, and recreate in close proximity to new and existing oil and gas facilities that will continue to emit harmful air pollution as a result of the Delay Rule.[8] As associations, Petitioners have standing to bring this case on behalf of their

---

[8] *See* ADD_254-55, 256, 260 ¶¶ 16-17, 20, 27 (Proville-Mirtich); ADD_305-06, 315-16 ¶¶ 1-2, 16-17 (Schreiber); ADD_230, 236-37, 244 ¶¶ 1-2, 9-11, 22 (Palacios); ADD_285-87 ¶¶ 2-3, 6, 8-10 (Richardson); ADD_114-16 ¶¶ 6, 8 (Levenshus); ADD_189-91 ¶¶ 2-8 (McNall); ADD_103-05 ¶¶ 1-6 (Graber); ADD_164, 168-70 ¶¶ 4, 13-18 (MacFarlane); ADD_274-75, 77-82 ¶¶ 1-3, 10-19 (Ramirez); ADD_176-77 ¶ 8 (Magaña); ADD_145, 147 ¶¶ 1-2, 5 (Kuehn); ADD_133 ¶ 12 (Jones); ADD_213-19 ¶¶ 20-36 (Nichols); ADD_184-85 ¶ 13 (Maher); ADD_227-28 ¶ 19 (Pagel); ADD_136, 139-40 ¶¶ 5, 19-21 (Kemper); ADD_14, 16-18, ¶¶ 5, 11-17 (Bower-Bjorson); ADD_202-05 ¶¶ 11-18 (Michaels); ADD_82-83 ¶ 34 (DelBuono); ADD_151-56 ¶¶ 1-9 (Leach); ADD_297-300 ¶¶ 9-12 (Satrom); ADD_380 ¶ 8 (Yeung); ADD_86-87, 92-93, 101 ¶¶ 1-2, 5, 17-19, 35 (Deville); ADD_368-72, 375 ¶¶ 1-8, 15 (Weiss).

members because those members would have standing in their own right; neither the claims asserted nor the relief requested require individual participation; and the interests at stake are germane to Petitioner organizations' purposes. *See Healthy Gulf v. Dep't of Interior*, 152 F.4th 180, 189 (D.C. Cir. 2025). Pollution reduction and public health protection are relevant to Petitioners' purposes as national and regional nonprofit groups that advocate for stronger health and environmental protections for their members and the public.[9]

Because of the Delay Rule, oil and gas facilities will emit millions of tons of methane and volatile organic compounds and hundreds of thousands of tons of hazardous air pollutants between now and the end of 2028 that would have otherwise been controlled under the 2024 Rule. *See supra* p.13; *see also* ADD_265-68 ¶¶ 34, 36 (Proville-Mirtich). Petitioners' members are currently being exposed to these emissions. *Id.* at 265-73 ¶¶ 23-34. And they face health risks from such increased emissions, causing injury. *See Clean Wisconsin v. EPA*, 964 F.3d 1145, 1156 (D.C. Cir. 2020).

For example, Don Schreiber had open-heart surgery for congestive heart failure in 2014 and has post-operative residual congestive heart failure. ADD_311

---

[9] *See* ADD_246-70 (Proville-Mirtich); ADD_113-16 (Levenshus); ADD_173-79 (Magaña); ADD_128-34 (Jones); ADD_180-87 (Maher); ADD_221-28 (Pagel); ADD_12-28 (Bower-Bjorson); ADD_197-206 (Michaels); ADD_377-80 (Yeung); ADD_85-101 (Deville); ADD_367-76 (Weiss).

¶ 11 (Schreiber). The Delay Rule's additional emissions of volatile organic compounds will contribute to already elevated ozone levels where he lives, increasing the risk of worsening his heart condition and causing other respiratory and cardiovascular problems. Other Petitioners' members and their families suffer from asthma, respiratory conditions, and other adverse health conditions, which can be caused or exacerbated by pollution from oil and gas facilities.[10] Petitioners' members have directly experienced adverse impacts from emissions and associated processes, including venting, flaring, and leaking wells, near where they live, work, and recreate.[11] As a result, Petitioners' members spend less time outdoors, keep their windows closed, and take other steps to reduce their exposure, thereby causing aesthetic and recreational injuries.[12] *See Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1017-18 (D.C. Cir. 2014) (finding injury-in-fact where members spent less time outdoors due to concerns about health risks from emissions). Further,

---

[10] *See* ADD_304-17 (Schreiber); ADD_229-45 (Palacios); ADD_284-92 (Richardson); ADD_188-96 (McNall); ADD_102-12 (Graber); ADD_163-72 (MacFarlane); ADD_273-83 (Ramirez); ADD_135-43 (Kemper); ADD_12-28 (Bower-Bjorson); ADD_68-84 (DelBuono); ADD_85-101 (Deville).

[11] *See* ADD__304-17 (Schreiber); ADD_229-45 (Palacios); ADD_284-92 (Richardson); ADD_188-96 (McNall); ADD_102-12 (Graber); ADD_273-83 (Ramirez); ADD_207-20 (Nichols); ADD_135-43 (Kemper); ADD_12-28 (Bower-Bjorson); ADD_85-101 (Deville); ADD_367-76 (Weiss).

[12] *See* ADD_304-17 (Schreiber); ADD_284-92 (Richardson); ADD_102-12 (Graber); ADD_273-83 (Ramirez); ADD_207-20 (Nichols); ADD_135-43 (Kemper); ADD_12-28 (Bower-Bjorson); ADD_68-84 (DelBuono); ADD_293-303 (Satrom); ADD_367-76 (Weiss).

Petitioners' members face injury from climate change impacts connected to additional methane emissions.[13] *See Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 77 (D.C. Cir. 2020) (finding standing based on climate change harms). The methane emissions at issue here will have a substantially larger climate-warming impact than the hydrofluorocarbon emissions at issue in *Wheeler*. *See* ADD_268-69, ¶ 37 (Proville-Mirtich).

These injuries are all directly traceable to the Delay Rule, which delays oil and gas facilities' compliance with substantial portions of the 2024 Rule's requirements and allows states to delay emission reductions. *See* ADD_258-68, ¶¶ 23-36 (Proville-Mirtich); *NRDC v. EPA,* 755 F.3d at 1017. And they would be redressed by a favorable decision declaring the Delay Rule unlawful and restoring oil and gas facilities' and states' obligations to comply with and implement the 2024 Rule—thereby reducing harmful emissions and members' exposure. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc*., 528 U.S. 167, 181 (2000) (finding redressability satisfied where relief would lessen environmental harm).

---

[13] *See* ADD_304-17 (Schreiber); ADD_229-45 (Palacios); ADD_284-92 (Richardson); ADD_188-96 (McNall); ADD_102-12 (Graber); ADD_163-72 (MacFarlane); ADD_144-49 (Kuehn); ADD_135-43 (Kemper); ADD_12-28 (Bower-Bjorson); ADD_68-84 (DelBuono); ADD_150-52 (Leach); ADD_85-101 (Deville).

## STANDARD OF REVIEW

The Court "appl[ies] the same standard of review under the Clean Air Act as [it does] under the Administrative Procedure Act." *Am. Lung Ass'n*, 985 F.3d at 941 (quotation omitted); *see also* 42 U.S.C. § 7607(d)(1)(C). The Court "may reverse any…action found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9). Under this standard, agencies must engage in reasoned decision-making. *Michigan v. EPA*, 576 U.S. 743, 750 (2015). That means agencies must "examine the relevant data and articulate a satisfactory explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). Agency action is arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). When an agency changes its position based on "factual findings that contradict those which underlay its prior policy," it must "provide a more detailed justification." *Fox*, 556 U.S. at 515.

## ARGUMENT

**I.    EPA's Failure to Consider Emission Impacts of the Delay Rule Violates Section 111 and the Requirement for Reasoned Decision-Making.**

In issuing the Delay Rule, EPA ignored key factors that must be considered when setting or revising section 111 standards: the consequent public health and environmental impacts. That failure flatly contravenes this Court's decision in

*American Lung Association*, which holds that EPA must consider emission impacts when amending section 111 deadlines because reducing pollution is "arguably the most important aspect" of the problem and "the central purpose" of the statute. 985 F.3d at 947, 995, 993.

> **A.** **EPA Failed to Consider Emission Impacts in Violation of Section 111.**

EPA failed to comply with the requirements of the statutory authority it invoked to promulgate the Delay Rule, Clean Air Act section 111. *See* 90 Fed. Reg. at 55673. As this Court has held, EPA may not delay section 111 standards without considering the resulting emission impacts and the attendant harms to people and the environment. *Am. Lung Ass'n*, 985 F.3d at 993-95. The Agency must explain how any delay is "consistent with the core objectives of the Clean Air Act" and consider the "need for speed" to avoid the "human and environmental costs" of any delay. *Id.* at 993-94. To that end, EPA may not focus solely on the interests of regulated industry in altering compliance dates of a section 111 rule, but must weigh those interests against environmental and health harms from prolonged exposure to pollution, placing a "high priority on efficiently and effectively reducing emissions." *Id.* at 947.

EPA has not done so here. The Agency never explained or considered how the Delay Rule comports with section 111's goal of reducing air pollution, and neither the Interim Final Rule nor the Delay Rule makes *any* mention of the

climate or health harms associated with the pollutants the 2024 Rule sought to mitigate. *See Am. Lung Ass'n*, 985 F.3d at 993-95 (faulting different delay rule because "one would have no idea that the EPA actually recognized" the need to reduce pollution). Each of the delays is based on EPA's blind and unexplained acceptance of "information received in petitions for reconsideration" submitted by the regulated industry. 90 Fed. Reg. at 55674. But the Delay Rule makes no attempt to weigh those concerns against the increased harm to public health and the climate, let alone place a "high priority" on reducing emissions. *See, e.g.*, *id.* at 55673-74 (summarizing rule and discussing industry compliance concerns without discussing public health or climate); 90 Fed. Reg. at 35969-70 (same). The Agency simply gave no consideration to the "need for speed" or "prompt reduction" of emissions. *Am. Lung Ass'n*, 985 F.3d at 993.

Petitioners commented that the Delay Rule violated *American Lung Association*'s requirement for EPA to consider the public health impacts resulting from any delay in compliance deadlines. EPA acknowledged Petitioners' comment but provided no substantive response. *See* JA_____-_____[RTC_46-47]. Just as in *American Lung Association*, "Petitioners called the EPA's attention to an important aspect of the regulatory problem, and the EPA looked away." 985 F.3d at 994.

EPA sought to justify its failure by drawing a distinction found nowhere in the Clean Air Act, asserting that the Delay Rule's revisions involve "compliance

deadline issues" as opposed to "substantive amendments" to the standards themselves. 90 Fed. Reg. at 55674; *see also* JA_____[RTC_27] (stating that EPA "disagrees...that the [Rule] violated any provision of CAA Section 111" because "the specific changes are related to limited, targeted[] extensions"). This Court has repeatedly rejected any such distinction. *See Clean Air Council*, 862 F.3d at 6 (concluding EPA's delay of section 111 methane rule compliance dates was "tantamount to amending or revoking a rule"); *Env't Def. Fund v. EPA*, 716 F.2d 915, 920 (D.C. Cir. 1983) ("The suspension or delayed implementation of a final regulation normally constitutes substantive rulemaking...."). Indeed, in *American Lung Association* itself, EPA had extended the time for states to submit plans to implement section 111 standards from nine months to three years. 985 F.3d at 940. As this Court has recognized, delaying compliance with important emission-reduction standards necessarily entails significant public health and environmental impacts, and must be treated the same as any other amendment to the standards.

The Delay Rule's failure to consider public health and climate harms stands in sharp contrast to the 2024 Rule, which gave "careful consideration" to the impacts of air pollution and greenhouse gas emission on communities as well as the need for speed in reducing those emissions. *See supra* p.7. There, EPA set compliance timelines that carefully balanced the benefits of pollution reductions with implementation considerations. *See, e.g.*, 89 Fed. Reg. at 17010 (state plan

deadline); *see supra* p.7-8. In the Delay Rule, EPA offered no rationale for its newfound position that only industry interests matter when delaying implementation. *See Am. Lung Ass'n*, 985 F.3d at 994 (noting that EPA's explanation was "contrary to its explanation of the rule it displaced"); *see also infra* p.57-60.

By ignoring environmental and public health consequences of the amended deadlines and silently eschewing its prior effort to balance the different factors relevant to section 111, EPA offered a "radically incomplete explanation" for the Delay Rule and ignored "arguably the most important aspect" of the problem. *Am. Lung Ass'n*, 985 F.3d at 994-95.

**B. EPA's Economic Impact Analysis Does Not Remedy the Delay Rule's Legal Deficiencies.**

Although EPA prepared a cursory "Economic Impact Analysis" Memorandum for OMB's review that contains some limited discussion of public health impacts, EPA expressly disclaims any reliance on that analysis in its decision-making. JA_____[RTC_31]; *see supra* p.13. The Memorandum therefore cannot remedy EPA's failure to comply with the law. *Michigan v. EPA*, 576 U.S. 743, 760 (2015) (holding the Court could not rely on regulatory impact analysis prepared for OMB where the agency had expressly disclaimed reliance on the analysis).

But even if the Memorandum *had* played a role in EPA's decision, it would not remedy EPA's legal violations because it presents a one-sided analysis emphasizing industry's cost savings while broadly ignoring the human health costs. *See Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1198 (9th Cir. 2008) (holding agency "cannot put a thumb on the scale by undervaluing the benefits and overvaluing the costs of more stringent standards"); *see also Michigan*, 576 U.S. at 753 ("[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions.").

First, as to the new-source standard delays, EPA arbitrarily ignored the additional pollution altogether. JA_____-_____[Memorandum_1-2]. That omission from both the Memorandum and the Delay Rule is arbitrary because the impact of the forgone reductions is considerable. *See* ADD_263-69, ¶¶ 33-37 (Proville-Mirtich) (estimating significant additional pollution from new-source delays). At the very least, the impact "is certainly not zero." *Ctr. for Biological Diversity*, 538 at 1200; *see also 350 Montana v. Haaland*, 50 F.4th 1254, 1265-66 (9th Cir. 2022) (finding arbitrary an environmental assessment that summarily determined emission impacts would be minor).

Indeed, until January 2027, EPA has relieved new and modified sources from compliance with the standard for zero-emission process controllers (which make up 65% of methane emissions from oil facilities, 89 Fed. Reg. at 16881),

eliminated the Super Emitter Program (designed to mitigate the largest emission events), and delayed the criteria for operators to determine which storage tanks are subject to the 2024 Rule. *See supra* p.10-11. These are substantive provisions that EPA carefully crafted in consideration of the relevant factors under section 111 and the statute's "central purpose" of abating harmful emissions. Relief from compliance with these standards necessarily allows more pollution than would have otherwise occurred—a fact that EPA ignores.

In an effort to excuse this failure, EPA contended that the delayed provisions are, "for the most part," compliance-assurance mechanisms. JA_____[Memorandum_2]. This response ignores the requirements—including the process controller standards and the Super Emitter Program—that are *not* compliance assurance mechanisms but instead core provisions of the 2024 Rule driving emission reductions. And the Agency is wrong to assert that extensions of compliance-assurance mechanisms are non-substantive. In fact, they are essential to ensure achievement of the standards' material goal of reducing emissions. Absent effective monitoring, testing, and implementation, the substantive standards are wholly unenforceable and ineffective. *See* 42 U.S.C. § 7411(b)(1)(B)-(c); ADD_263-65 ¶¶ 33 n.12, 34 n.13 (Proville-Mirtich); *see also, e.g., supra* p.11; *infra* p.53-56.

Second, for the existing source standards, the Memorandum acknowledged the additional emissions of methane, volatile organic compounds, and hazardous air pollutants in 2028 resulting from the delay but still failed to adequately weigh the impacts of this pollution against any compliance considerations. *See* JA_____[Memorandum_6]. Specifically, while EPA quantified cost savings to industry, JA_____[Memorandum_5], it arbitrarily failed to monetize the consequent ozone and climate harms.

EPA's approach in the 2024 Rule belies its new claim that the Agency was "unable" to monetize health effects. JA_____[Memorandum_7]. For the 2024 Rule, EPA monetized the public health benefits of curbing the volatile organic compound emissions that contribute to ozone, accounting for "avoided premature deaths, reductions in new asthma cases and incidences of asthma symptoms, reductions in hospital admissions and emergency department visits, and reductions in lost school days." 89 Fed. Reg. at 17019. EPA estimated these benefits are worth $7.0 billion (at a 2% discount rate). *Id.* In contrast, for the Delay Rule, EPA claimed it could not monetize health effects because the 2024 Rule estimated emission impacts for both the new-source and existing-source standards, while for the Delay Rule, the Agency only examined existing-source emissions. JA_____[Memorandum_7]; *see also* JA_____[RTC_34]. But nothing prevents EPA from monetizing the health effects of, at minimum, the existing-source delay's

effects (for which it already estimated forgone emissions); the Agency simply chose not to do so. EPA has thus failed to offer a "reasoned explanation…for disregarding facts and circumstances that underlay" its prior decision in the 2024 Rule to quantify these impacts. *Fox*, 556 U.S. at 516.

Similarly, in the 2024 Rule, EPA finalized a peer-reviewed report updating methodologies to monetize the climate benefits from curbing methane emissions and determined that the 2024 Rule would prevent $110 billion in climate damages. 89 Fed. Reg. at 16835-36 (discussing methodology). In the Delay Rule, EPA declined to monetize the climate harms from postponing control requirements, claiming too much uncertainty exists to do so. JA_____,_____[Memorandum_6, 10]; *see* ADD_27-43 (Buma). Yet EPA failed to even acknowledge the departure from its prior practice. JA_____[Memorandum_10]; *Fox*, 556 U.S. at 515 ("An agency may not…depart from a prior policy *sub silentio*…"). Nor did EPA grapple with its prior factual findings from the 2024 Rule showing that uncertainty does not prevent monetizing climate impacts. *Fox*, 556 U.S. at 515-16; *see also id.* at 537 (Kennedy, J., concurring in part and concurring in the judgment) (an agency may not "disregard contrary or inconvenient factual determinations that it made in the past"). In fact, EPA failed even to provide any *qualitative* discussion of climate impacts—entirely ignoring "an important aspect of the problem." *Am. Lung Ass'n*, 985 F.3d at 995 (quoting *State Farm*, 463 U.S. at 43).

In sum, the Delay Rule violates the Clean Air Act by delaying meaningful oil and gas standards without considering "the central purpose" of section 111—reducing pollution harms. *Id.* at 993. The Court should vacate it.

## II. The Delay Rule Violates the Clean Air Act's Limitation on Stays Pending Reconsideration.

The Delay Rule is additionally unlawful because it is subject to—and violates—the Clean Air Act's express limitations on stays pending reconsideration. 42 U.S.C. § 7607(d)(7)(B). The Act includes specific authority for EPA to suspend a rule's effectiveness during a reconsideration process, but this authority is narrowly circumscribed—relevant here, any such stay is limited to three months. *Id.* The multi-year postponements provided by the Delay Rule far exceed this time limit.

Instead of complying with section 307, EPA cites section 111 as authority for the Delay Rule (without, however, showing that the delayed standard meets section 111's substantive requirements; *see supra* Section I). But "EPA cannot escape Congress's clear intent to specifically limit the agency's authority under Section [307] by grasping at its separate, more general authority"—here, its section 111 authority. *Air All. Houston*, 906 F.3d at 1061. "Congress saw fit to place a three-month statutory limitation on [stays pending] 'such reconsideration'…and this court 'must give effect to the unambiguously expressed intent of Congress.'" *Id.* (quotations omitted).

EPA's own statements and the circumstances of the rulemaking demonstrate that the Delay Rule's purpose is to buy time for the agency to reconsider the rule, falling directly within the scope of section 307. *See id.* at 1061-63 (finding "a stay pending reconsideration" occurs when EPA takes more time "to decide what it wants to do, rather than [make] a substantive amendment to" a rule); *NRDC v. Reilly*, 976 F.2d 36, 38 (D.C. Cir. 1992) (holding section 307(d)(7)(B)'s limitations applied despite invocation of a separate authority where "the stays…represented a continuation of the reconsideration process"). For example, EPA Administrator Zeldin recently testified to Congress that reconsideration of the 2024 Rule has involved "a multiple phased process," including an impending proposal to amend the 2024 Rule and a delay of compliance deadlines "to allow us to fix…the flaws with the [2024 Rule]."[14]

The Delay Rule's record further confirms that it was aimed at buying more time to address substantive issues raised in reconsideration petitions. Indeed, EPA rejected commenters' requests to "extend implementation further," not because the Agency determined additional time was unwarranted, but because "EPA is reconsidering the 2024 Final Rule." JA_____[RTC_15]; *see also* 90 Fed. Reg. at 35971 (determining extension "is sufficient for present purposes" because "a

---

[14] Statement of Lee Zeldin, Adm'r, EPA, *supra* note 3, at 1:07:56.

separate rulemaking action will address the substantive problems raised"). The Agency thus selected new deadlines based on when it expected to complete the reconsideration rule—not on an evaluation of the time needed for compliance. The Delay Rule is therefore the "functional equivalent of a stay" pending reconsideration because it is, in fact, a "direct outgrowth" of a process to reconsider the 2024 Rule. *Air All. Houston*, 906 F.3d at 1063.

Furthermore, as a rationale for many of the delays, EPA cites claimed problems with the substantive design of the underlying standards rather than the need for more time for industry to comply with such standards. For example, EPA alleges:

- test methods as "not always feasible," 90 Fed. Reg. 35971;

- monitoring requirements as presenting "substantive problems," *id.*;

- regulatory text as "ambiguous," *id.* at 35974, or containing "problematic regulatory language," *id.* at 35969; and

- specific requirements as "technically and economically infeasible," *id.* at 35973.

Even taking these concerns as accurate (which they are not; *see infra* Section III, EPA has not addressed them in this Delay Rule by, for example, amending the regulatory text or changing the standards' requirements. Instead, it has provided additional compliance time to allow EPA to revise or rescind the underlying

31

standards in the 2024 Rule as part of its "ongoing" reconsideration. EPA Status Report 2, *Texas v. EPA*, No. 24-1054 (Mar. 23, 2026), Doc. 2165169.

In addition, EPA was "indisputably" responding to section 307 petitions in issuing the Delay Rule. *Air All. Houston*, 906 F.3d at 1061. The Agency asserted that the deadline extensions were "necessary" "[b]ased on information received in petitions for reconsideration." 90 Fed. Reg. at 55674. Indeed, the Delay Rule directly and repeatedly refers to the industry reconsideration petitions as justification for the delays. *See, e.g.*, 90 Fed. Reg. at 35970 ("Multiple petitions for reconsideration…raised concerns"), 35969 ("Based on information received in petitions for reconsideration…."); 90 Fed. Reg. at 55674 (same), 55677 ("to address the…issues raised by petitioners"). *See also infra* Section III (discussing EPA citing petitions for reconsideration as justification for each of the delays).

EPA has thus left no doubt that it is postponing requirements of the 2024 Rule in order "to decide what it wants to do" about the underlying standards. *Air All. Houston*, 906 F.3d at 1063. The Agency indisputably plans "to consider petitions for reconsideration of the [original rule] and take further regulatory action." *Id.* at 1060-61. The Delay Rule thus constitutes a stay pending reconsideration. *See id.* Because EPA cannot "misuse [] its substantive rulemaking authority" under section 111 "to evade" section 307's strict three-month limit on

stays pending reconsideration, *id.* at 1066, the Delay Rule is unlawful and should be vacated.

### III. The Rule Is Arbitrary and Capricious Because EPA Failed to Provide Reasoned Justifications for the Extensions.

In promulgating the 2024 Rule, EPA considered and responded to nearly one million comments, issuing specific factual determinations about feasibility and appropriate implementation timelines. In the Delay Rule—issued just one year later—the Agency simply abandoned its 2024 conclusions, citing undisclosed stakeholder conversations and unsubstantiated industry representations. The Agency's change in position is unreasoned and unsupported.

The same two errors riddle EPA's reasoning for eleven distinct deadline extensions in the Delay Rule. First, the Agency repeatedly fails to adequately explain its about-faces from the 2024 Rule. In the 2024 Rule, EPA considered and largely rejected industry concerns that now form the basis for the Delay Rule. Agencies changing course, as EPA has here, "must supply a reasoned analysis." *State Farm*, 463 U.S. at 57 (quotation omitted). But the Agency here has not shown that "there are good reasons" for its changes, let alone offered anything close to a "detailed justification" explaining its newfound, contradictory factual conclusions. *Fox*, 556 U.S. at 515; *see also Sinclair Wyo. Refining Co. v. EPA*, 114 F.4th 693, 713 (D.C. Cir. 2024) ("EPA made no attempt to explain its about-face on this

critical assumption, and that failure of explanation alone renders EPA's...actions arbitrary and capricious.").

Second, time and again, the Delay Rule's "record evidence did not adequately support EPA's assumption[s]." *Sinclair Wyo. Refining*, 114 F.4th at 713. EPA based its determinations on vague mentions of "recent communications" and "stakeholder engagement," 90 Fed. Reg. at 55673-74—none of which are in the record. EPA labeled these unidentified communications "credible concerns," *see, e.g.*, *id.* at 55676, without engaging in its own analysis or explaining why its factual conclusions from 2024 no longer hold. But the Agency cannot unquestioningly accept regulated parties' assertions at face value without critical review and without other record evidence. *Susquehanna Int'l Grp. v. SEC*, 866 F.3d 442, 447 (D.C. Cir. 2017). "If an agency relies on a regulated party's analysis to justify its decision, it must either critically review that analysis or perform its own." *Affirmed Energy, LLC v. FERC*, 166 F.4th 1070, 1083 (D.C. Cir. 2026). Further, in several instances, EPA ignored information it received that contradicts industry's claims. *See Sierra Club v. EPA*, 863 F.3d 834, 838 (D.C. Cir. 2017). The Agency's factual judgments thus lack the support of "substantial" evidence—a fatal flaw. *Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984) ("[I]t is impossible to conceive of a

34

'nonarbitrary' factual judgment supported only by evidence that is not substantial." (quotation omitted)).

EPA has fallen far short of satisfying standards for reasoned decision-making on eleven discrete deadline extensions. Petitioners describe these shortcomings in turn.

### A.     Zero-Emitting Process Controllers.

In the 2024 Rule, EPA required new sources to use zero-emitting process controllers and provided a one-year phase-in period. Now, EPA has extended the compliance deadline by another eighteen months. 90 Fed. Reg. at 55677. The Agency failed to adequately explain its change in position from determinations made just one year prior, and its action lacks record support.

In the 2024 Rule, EPA expressly considered supply chain issues for process controllers and determined that it was appropriate for new sources to comply with the zero-emission standard within one year after promulgation. EPA specifically granted that additional year "[t]o address potential delays in the availab[ility] of equipment." JA_____[2024 RTC_I-11-9].[15] In developing the compliance schedule, the Agency considered comments asserting that procurement lead times can range from three months to twenty-four months, and countervailing evidence

---

[15] All citations are to page numbers (not comment or response numbers).

from a research report that "suppliers are well-equipped to meet anticipated demand within the EPA's proposed regulatory timeline." 89 Fed. Reg. at 16929. After weighing and considering these pieces of evidence, EPA allowed twelve months to comply. *Id.*

EPA, though, has not provided an adequate rationale for its new factual findings that the original timeline was insufficient and an additional eighteen months was necessary—let alone offered the "more detailed justification" that is required. *Fox*, 556 U.S. at 515; *see Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 106 (2015). The Agency relied only on a trade association petition, meeting notes with that same association, and comments from the association. 90 Fed. Reg. at 35974 (citing JA_____[EPA-HQ-OAR-2025-0162-0010_10][16] (INGAA Petition (May 15, 2024)), JA_____[EPA-HQ-OAR-2025-0162-0019_4] (INGAA Supplemental Letter (Oct. 15, 2024))); 90 Fed. Reg. at 55677 (citing JA_____[EPA-HQ-OAR-2025-0162-0184)] (INGAA Comment (Oct. 3, 2025))). None of those documents provide adequate evidence sufficient to support EPA's changed factual determination.

---

[16] The Interim Final Rule cites documents in the 2024 Rule's docket; EPA reproduced those documents for the Delay Rule's docket with updated docket numbers. Where applicable, all citations are to the updated docket numbers, with the document's original date.

First, the documents offer bare assertions, without data or evidence, stating only that the supply chain "currently requires 12-18 months to deliver certain types of components." JA_____[INGAA Petition_10]. Second, even the trade association's stated timeline does not support EPA's action: the 2024 Rule *already* provided twelve months of lead time, and EPA's deadline extension provides a total of thirty months—far more than the timeline identified by the trade association. Third, these "self-serving views of the regulated entities" are particularly unpersuasive and cannot alone underpin reasoned decision-making. *NetCoalition v. SEC*, 615 F.3d 525, 541 (D.C. Cir. 2010).[17]

In addition, EPA ignored contradictory record evidence from at least two comments on the Interim Final Rule. Kathairos Solutions, a supplier of zero-emitting process controller technology, commented that it and other providers are "able to supply industry with the equipment needed to meet the original" deadlines of the 2024 Rule. JA_____[EPA-HQ-OAR-2025-0162-0156] (Kathairos Comment (Oct. 1, 2025)). Kathairos noted that its technology is already used by more than sixty operators across thousands of facilities. JA_____[Kathairos Comment]. Another commenter noted one operator's successful replacement of more than 8,000 process controllers, demonstrating that conversions can be conducted at

_____

[17] *Superseded by statute on other grounds*, Pub.L. No. 111-203, 124 Stat. 1376 (2010), as recognized in *NetCoalition v. SEC*, 715 F.3d 342 (D.C. Cir. 2013).

scale. JA_____[EPA-HQ-OAR-2025-0162-0185_7] (TCS Comment (Oct. 3, 2025)). EPA did not consider either of these comments, which directly contradict its proffered rationale. EPA also made no mention of the report it previously relied on demonstrating supply chain stability. *See* 89 Fed. Reg. at 16929; *see Sierra Club*, 863 F.3d at 838 ("Although EPA provided some explanation...EPA failed to respond adequately to comments disputing those explanations."); *see also Action on Smoking and Health v. CAB*, 699 F.2d 1209, 1217 (D.C. Cir. 1983).

Further, when EPA issued the Interim Final Rule in July 2025, the zero-emission standard had already been in effect for several months. Thus, although real-world data on the standard's implementation was available, EPA neglected to investigate. The Agency's reliance on self-serving statements from the trade association, while failing to "examine the relevant data" from other commenters, is therefore especially egregious here. *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1115 (D.C. Cir. 2019) (quotation omitted).

**B.     Super Emitter Program.**

In the 2024 Rule, EPA adopted the Super Emitter Program to ensure that operators quickly investigate and respond to timely notifications of large methane emission incidents. 89 Fed. Reg. at 16877. Under the Program, EPA-certified third parties using EPA-approved technologies can alert the agency of large emission incidents. EPA is then responsible for verifying the information and notifying

operators. EPA issued seven such notifications under the Program before suspending it in the Interim Final Rule.[18] The Agency's decision to delay the Program lacks record support and is devoid of any rational connection between EPA's stated concerns and its course of action.

EPA pointed to two "unanticipated difficulties" related to the Program. 90 Fed. Reg. 35976. As its first justification, the Agency stated that the 2024 Rule does not require third parties to identify the specific operator responsible for a super-emitter incident and claims that it has been "labor-intensive" for the Agency to do so. *Id.* In fact, the 2024 Rule required third parties to identify any owner or operator within fifty meters of the super-emitter event, "if [the information is] available." 89 Fed. Reg. at 16880. Moreover, EPA provided no data or analysis to substantiate its claim that identifying the responsible operator has unduly taxed agency resources. It did not disclose, for example, how many of the seven reported super-emitter events lacked attribution data, or how long it took the Agency to identify the relevant operators. The Agency's bald assertion falls short of "record evidence" to "adequately support EPA's assumption[s]." *Sinclair Wyo. Refining*, 114 F.4th at 713. In fact, EPA issued all seven notifications within eleven days of

---

[18] EPA, EPA Methane Super-Emitter Program Data Explorer, https://perma.cc/55XS-9U98.

detection, confirming that attribution was accomplished promptly and without undue administrative burden.[19]

Further, EPA conceded that it has thus far received "few submittals," thereby limiting the total labor required—but goes on to theorize that "*if* the number of notifications...were to substantially increase," the Agency's "ability to timely provide the notification...would be constrained." 90 Fed. Reg. 35976 (emphasis added). Such speculation is insufficient to support reasoned decision-making. *See Sorenson Comm'ns Inc. v. FCC*, 755 F.3d 702, 708-09 (D.C. Cir. 2014) (explaining that agency's predictive judgements must be "based on some logic and evidence, not sheer speculation" (quotation omitted)). EPA also simply ignored the corresponding effect on pollution under its own hypothetical: an increase in notifications means more super-emitter incidents being identified and more pollution abated.

Besides, EPA has not explained how delaying the Super Emitter Program solves any problem related to timely attribution. And EPA's stated concern—that "[d]elays in providing the notifications" would limit "the opportunity to take corrective action," 90 Fed. Reg. 35976—is *worsened* by pausing the entire Program, not improved. EPA's decision thus lacks "a rational connection between

---

[19] *Id*.

the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quotation omitted).

EPA's second justification fares no better. The Agency identified a single instance in which it received a super-emitter notification regarding a facility not subject to EPA's oil and gas regulations. 90 Fed. Reg. 35976. The Agency raised concerns about the Program's requirement to post and notify even non-covered facilities of the emissions event. But it is irrational to suspend the *entire* Program based on a *single* event, especially when a targeted clarifying revision to the Program (unlike a wholesale delay) could have directly addressed EPA's concern about its lack of discretion.

### C.     Low-Emitting Valves.

The 2024 Rule included requirements to replace leaking valves with low-emitting ("low-e") options, such as replacing the valves or installing low-emission packing, unless technically infeasible. 90 Fed. Reg. at 35973. EPA has delayed those requirements until January 2027, but the agency's stated rationale lacks support in the record.

EPA offers two justifications for the delay. First, it claims the 2024 Rule text created "confusion" both because of a misprint issue in the Code of Federal Regulations and because it could be interpreted to require operators to repair a valve and then immediately replace the now-repaired valve. *Id*. at 35973. But

neither of these issues are addressed by a compliance delay. EPA has already

clarified that it "was not [its] intention to require that a source repack an existing

valve and replace that valve during the same repair." *Id.* If this clarification were

not enough to clear up any lingering confusion, EPA does not explain why a

deadline extension—which offers no relief as to confusion—was a better choice

than fixing the misprint and supposedly "confusing" language. EPA's rationale

cannot justify the final rule's deadline extension.[20]

Second, EPA states that the delay provides sources with time to obtain low-e

equipment "given the cost and widespread need for such equipment." 90 Fed. Reg.

at 55677. The Agency bases this concern on "credible" information that the needed

equipment is "not commercially available." *Id*. But the record contains no such

information. EPA cites only one reconsideration petition raising concerns about

low-e equipment availability. *Id.* at 35973 n.32 (citing JA_____[GPA Petition]).

That petition does not even mention supply constraints—instead, it takes issue with

the *cost* of compliance, requests EPA reconsider the requirements and, while doing

so, stay the low-e valve requirements for three months pursuant to Clean Air Act

---

[20] To the extent EPA requires additional time to address confusion, that time would constitute a stay pending reconsideration, subject to the limits of section 307(d)(7)(B). *See supra* Section II.

section 307(d)(7)(B). JA_____-_____[GPA Petition_9-10].[21] EPA cannot rely on information that it never received or aired for comment. And even if the petition had discussed general supply constraints, the Agency abdicated its responsibility for reasoned decision-making by "simply summariz[ing]" regulated entities' comments and then "announc[ing]" that it "was 'persuaded.'" *In re NTE Conn., LLC*, 26 F.4th 980, 988 (D.C. Cir. 2022).

**D.      Enclosed Combustion Devices: Performance Testing.**

EPA's 2024 Rule included performance testing requirements for enclosed combustion devices. The Agency has now delayed these requirements, supposedly in order "to address the supply chain, personnel, and laboratory limitations identified by [industry] petitioners." 90 Fed. Reg. at 35971. But EPA has failed to explain its change in position from the 2024 Rule, and its decision is unsupported by the record.

In the Delay Rule, the Agency cites just one petition for reconsideration to support its delay of performance testing requirements. *See* JA_____[API/AXPC Petition]. The petition, though, only made general assertions that "additional time is needed," JA_____[API/AXPC Petition_5], and raised concerns that EPA already addressed in the 2024 Rule. For example, the petition argued that installing

_____

[21] *See supra* Section II (discussing EPA's clear intent to circumvent limits of section 307(d)(7)(B)).

monitoring equipment requires specialized labor. JA_____[API/AXPC Petition_5]. But the Agency already "address[ed] labor availability concerns" by reducing the number of sources that need to comply. JA_____[2024 RTC_II-20-81]; *see also* JA_____[2024 RTC_II-20-79].

The 2024 Rule also dealt with the more generalized supply chain concerns. JA_____-_____[2024 RTC_II-17-74 to 75]; JA_____[2024 RTC_ II-17-76] ("EPA has made numerous changes to the final rule to ease the...supply chain issues."). To address these concerns, the 2024 Rule provided a pathway for operators to request approval for alternative approaches. JA_____[2024 RTC_II-17-76]. Overall, EPA in 2024 specifically concluded that it "*does not think that a year extension is needed for performance testing*," explaining that "the commenter has not provided data showing" that EPA's actions to mitigate the concerns were accounted for. JA_____[2024 RTC_II-17-77] (emphasis added).

The cited petition for reconsideration did not include any new information beyond the concerns EPA responded to in 2024. Nor did EPA explain why it no longer believes that the "numerous changes" it made in 2024 suffice to address those concerns. The Agency also did not explain why it rejected its prior conclusion that "the commenters provided no justification as to why [the rule's alternative compliance pathways] would not significantly reduce the supply chain issues." JA_____[2024 RTC_II-17-77]; *see Fox*, 556 U.S. at 516.

EPA's action here also lacks adequate support in the record. The Agency purported to rely on reconsideration petitioners' concerns that there are not enough testing firms available for the number of covered enclosed combustion devices, and not enough time for regulatory authorities to process alternative performance testing requests. 90 Fed. Reg. at 55675-76. But there is no record evidence of these concerns. Contrary to EPA's assertions, the petitioners did not specify any "laboratory limitations" or "supply chain" issues, only raising technical issues relating to testing duration and labor concerns. *See id.* at 55675; JA_____[API/AXPC Petition_5].[22] However, even with respect to the labor concerns, the petitioners failed to quantify vendor availability, offer evidence that work could not be completed within the timeline, or even identify how many devices still need to be tested. In fact, the requirements had already been fully in effect for more than a year prior to the Interim Final Rule's promulgation—yet EPA identified no evidence of widespread noncompliance. EPA's decision thus rested wholly on "anecdotes" from biased market participants. *NetCoalition*, 615 F.3d 525 at 541. This "unquestioning reliance" on a regulated entity's vague, speculative concerns does not pass muster. *Susquehanna*, 866 F.3d at 447.

---

[22] The laboratory limitations and supply chain concerns raised in the comments cited by EPA apply to the separate net heating value monitoring requirements—not the enclosed combustion device testing at issue here. *See, e.g.*, 90 Fed. Reg. at 55675 n.24.

The Delay Rule also ignored countervailing record evidence. Commenters submitted information showing that there are at least seventy-three available models of enclosed combustion devices that the Agency has already exempted from performance testing, and that there are many alternative testing methods already allowed by EPA. JA_____[EDF Comment_11]. Without any record evidence as to how many enclosed combustion devices remain untested, EPA had no basis to conclude that any extension was necessary. EPA neither acknowledged nor responded to this comment. *See generally* JA_____[RTC]. EPA "cannot ignore evidence that undercuts its judgment," nor "minimize such evidence without adequate explanation." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018).

**E.     Combustion Devices: Continuous Pilot Flames and Alarms.**

Federal regulations have long required a continuous flame when combustion devices are in operation to ensure complete combustion of vapors being routed through them. *See* 40 C.F.R. pt. 60. In 2024, EPA concluded that a continuous *pilot* flame is necessary to assure a continuous flame, JA_____[2024 RTC_II-17-1], and therefore included a requirement for a continuous pilot flame and accompanying monitoring requirements, including an alarm system to alert the operator when a pilot flame is unlit, *see* 90 Fed. Reg. at 35976-77.

EPA has now delayed these requirements, pointing to concerns about the need for supplemental gas to the pilot flames and issues with the remote geographic location of some sites. *Id.* at 35978-79; 90 Fed. Reg. at 55677. But EPA's factual determinations are devoid of record support and the Agency has failed to explain its change in position.

EPA cited to a single petition for reconsideration for support. *See* JA_____[API/AXPC Petition_13-14]. Yet the petition provides no technical detail, no supporting evidence, and no data concerning the supposed logistical difficulties; it does not even estimate how much additional time *would* (in the petitioners' view) be required. EPA has thus "effectively abdicated" its responsibility to make a reasoned determination by taking the regulated entity's word at face value without any independent review or verification. *Susquehanna,* 866 F.3d at 446. Reasoned decision-making "requires some record evidence reasonably adequate to support the finding" that this deadline extension was necessary; none exists here. *Orchard Hill Bldg. Co. v. Army Corps of Eng'rs*, 893 F.3d 1017, 1027 (7th Cir. 2018); *see also Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 544 (D.C. Cir. 1983) (vacating Clean Air Act rule due to lack of "substantial evidence to support EPA's belief").

**F.     Storage Vessels: Thirty-Day Potential-to-Emit Calculation.**

Federal standards have long included provisions explaining how operators should determine whether the new source standards apply to particular storage vessels, also known as tanks. Applicability depends on storage vessels' potential emissions; those with potential emissions below specific thresholds are exempt. 40 C.F.R. § 60.5365b(e). In 2024, EPA required operators to calculate potential emissions using the vessel's first thirty days of production. *See* 89 Fed. Reg. at 16978-79. Now, though, EPA has delayed the requirement to use this calculation method, ostensibly "to allow facilities time to obtain additional information and make the requisite decisions." 90 Fed. Reg. at 55677; *see also* 90 Fed. Reg. at 35976; JA_____[RTC_65].

There is no record support for EPA's rationale; such a "conclusory" and "unsupported supposition" is insufficient. *United Tech. Corp. v. U.S. Dep't of Defense*, 601 F.3d 557, 562, 565 (D.C. Cir. 2010) (quotation omitted). The Agency fails to identify what additional information facilities supposedly need to obtain, or how that information might affect operators' decision-making. In fact, petitioners did not even request this relief. Rather, they requested a simple clarification regarding how a subset of tanks should conduct the calculation. *See* 90 Fed. Reg. at 35975 (citing JA_____[API/AXPC Petition]). The petition cited by EPA only expressed confusion as to tanks that pre-dated the 2024 Rule's effective date (but

post-dated the applicability date), requesting a limited "stay...for *pre-effective date*

tanks." JA_____[API/AXPC Petition_7] (emphasis added). The same petitioners

later followed up with a proposed interpretation to clear up any confusion.

JA_____-_____[EPA-HQ-OAR-2025-0162-0011_5-6] (API/AXPC Supplemental

Petition (May 6, 2024)). And the regulated entities' "self-serving views...provide

little support" for EPA's actions. *NetCoalition*, 615 F.3d at 541.

EPA's decision is also irrational for two reasons. First, EPA has not

explained how a delay clears up any confusion, or why a delay is necessary when

the Agency could have instead adopted petitioners' proposed interpretation.[23] And

second, EPA's action was much broader than even the relief requested by

petitioners, extending to *all* storage vessels, not just pre-effective date equipment.

The Agency "comes up short" both on "whether the rulemaking record supports

whatever factual conclusions underlie the rule" and "whether the policy

determinations behind the rule are rational." *McGregor Printing Corp. v. Kemp*, 20

F.3d 1188, 1194-95 (D.C. Cir. 1994).

---

[23] To the extent that EPA requires more time to consider petitioners' proposed
interpretation, its action to stay the underlying requirement during reconsideration
would be subject to the limits of section 307(d)(7)(B). *See supra* Section II.

## G. Storage Vessels: Throughput-Based Modification Trigger.

EPA's delay of the throughput-based modification trigger similarly lacks record support. The 2024 Rule established that when a storage vessel's throughput increases, an operator must recalculate the vessel's potential emissions using the new throughput to determine applicability. If the new potential emissions are above a fixed threshold for either volatile organic compounds or methane, then the storage vessel has been "modified" and becomes subject to the 2024 Rule's provisions for new and modified sources. JA_____[2024 RTC_I-9-43]; 40 C.F.R. § 60.5365b(e)(3)(ii).

Now, EPA has delayed this modification trigger, offering only a single sentence of justification: a delay "would provide time" for sources "to make any needed adjustments to facility planning, equipment procurement, and process changes." JA_____[RTC_65]; *see also* 90 Fed. Reg. at 35975 (virtually identical); *id*. at 55677 (virtually identical). EPA does not explain why the multiple years between the 2024 proposed rule's release and EPA's current action have not already provided enough time for sources to conduct "facility planning." EPA similarly fails to identify what equipment, if any, is in short supply, and what process changes would require an additional eighteen months for sources to comply.

EPA's only record citations are generalized operator statements, such as projecting a "[c]ascading effect of storage tank applicability." JA_____[EPA-HQ-

OAR-2025-0162-0018_15] (Hess Meeting (Nov. 7, 2024)). These sweeping

assertions fall far short of providing a factual basis for an eighteen-month delay.

Besides, EPA "could not simply rubberstamp" regulated entities' assertions without

providing its own review or assessment. *In re NTE Conn.*, 26 F.4th at 988. In short,

EPA's delay of this provision is utterly unsupported by the record.

**H.      Legally and Practicably Enforceable Emission Limits.**

EPA arbitrarily and capriciously failed to explain its about-face on "legally

and practicably enforceable" limits. Agency regulations allow sources to rely on

emission limits issued under state law to demonstrate that their emissions are

below applicability thresholds—and that the sources are therefore exempt from the

federal standards—so long as those state emission limits are "legally and

practicably enforceable." *See* 90 Fed. Reg. at 35975. That general structure

predates the 2024 Rule and extends beyond the oil and gas regulations. In the 2024

Rule, EPA concluded that a sector-specific definition was necessary because the

Agency had "expended extensive resources in enforcement actions," and better

defining the exemption criteria would "reduce or eliminate such cases."

JA_____[2024 RTC_I-9-32]. EPA specifically determined that its "enforcement

history demonstrates" the new definition was "necessary." JA_____[2024 RTC_I-

9-23].

Now, EPA has taken precisely the opposite position without any new record evidence or explanation for the change. The Agency pointed to reconsideration petitions requesting "more time than afforded in the 2024 final rule" for state agencies to adopt compliant limits. 90 Fed. Reg. at 35975. But EPA already considered the same requests to delay the definition in the 2024 Rule and concluded it did "not see a need to delay finalizing the definition." JA_____[2024 RTC_I-19-16]; *see also* JA_____,_____[2024 RTC_I-9-21, I-9-25] (summarizing comments). EPA explained that additional time was unwarranted because operators and states had already been "on notice" of the new definition since the draft rule had been published several years prior. JA_____[2024 RTC_I-9-15]. And EPA specifically "address[ed] the...concern that certain states do not have permit programs" that comported with the new requirements, weighing it against the "unenforceable" nature of the prior criteria. JA_____-_____[2024 RTC_II-13-34 to 35]. EPA thus determined that "regulatory certainty" was necessary "to guide states" and ensure enforceability. JA_____[2024 RTC_II-13-35].

Neither the reconsideration petitions, the Interim Final Rule, nor the Delay Rule identified any change of circumstance or new information that EPA was unaware of in 2024. EPA did not explain why its prior concerns about enforceability are no longer of import, or why a delay is needed for "sufficient time" to establish compliant limits, 90 Fed. Reg. at 55677, when EPA rejected

those precise concerns just one year earlier. In other words, the Agency has not offered a "reasoned explanation...for disregarding facts and circumstances that underlay" the original rule. *Fox*, 556 U.S. at 514-16.

Further, EPA's action lacks record support. The Agency did not assess the progress states have made in adopting compliant limits or offer any information as to how this provision—which had already been in effect for more than a year—has played out in practice. Instead, EPA "effectively abdicated [its] responsibility" to conduct its own independent review of the facts. *Susquehanna*, 866 F.3d at 446.

## I.     Closed-Vent Systems.

For closed-vent systems, EPA has yet again failed to explain its change in policy, and the record does not support its rationale. In 2024, EPA finalized a standard of "no identifiable emissions" leaking from closed-vent systems. The Agency explained that the change from the previous requirement of "no *detectable* emissions…reflect[ed] the change in monitoring methods used for demonstrating compliance." 89 Fed. Reg. at 16898 (emphasis added). Now though, EPA has delayed the requirement to comply with the standard, expressing "serious concerns" about operators' ability to "meet the...requirements on the compliance schedule in the 2024 final rule." 90 Fed. Reg. at 55676.

EPA in 2024 rejected the precise concerns that it now relies on and has not explained its new change in position. In this action, EPA pointed to assertions in

petitions for reconsideration that leaks are "inevitable," because "normal wear and tear" will cause emissions "over time." *Id.*; JA_____[API/AXPC Petition_4].[24] Yet EPA considered these same claims leading up to the 2024 Rule, when commenters (including petitioners for reconsideration) argued against the standard's adoption because "a 'zero-emissions' standard can never be perfectly achieved:" "small leaks are unavoidable" and equipment "undergoes continuous wear and tear." 89 Fed. Reg. at 16985. EPA rejected those comments, explaining that the requirement to operate with no identifiable emissions to the atmosphere had previously been successfully applied to closed-vent systems in the oil and gas sector, as well as to other analogous emission sources. *Id.* at 16986. EPA further explained that the new terminology is not more stringent than the prior regulations; it merely reflects EPA's new approval of a different type of monitoring instrument. *Id*. In this action, the Agency has not identified any new information or explained its about-face. *See State Farm*, 463 U.S. at 57.

EPA's rationale is unsupported by the record in two further ways. First, the Agency failed to acknowledge the full scope of its action, let alone offer substantial evidence in support. EPA asserted that the Delay Rule narrowly delays inspection

---

[24] *See also* JA_____[ExxonMobil Petition_1]; JA_____[GPA Petition_14 to 15]; JA_____[Hess Meeting_16]; JA_____[EPA-HQ-OAR-2025-0162-0005_16] (API/AXPC Meeting (Mar. 18, 2024)) (each discussing leaks as unavoidable over time).

requirements relating to the "no identifiable emissions" standard. But the regulatory text suspends *all* monitoring and repair requirements for closed-vent systems. *See* 40 C.F.R. § 60.5416b (setting a January 22, 2027, effective date for inspection and monitoring requirements). EPA did not even acknowledge the practical effect of its new rule, erroneously claiming that operators "still must...perform initial and ongoing inspections." 90 Fed. Reg. at 55676; *but see, e.g.*, 40 C.F.R. § 60.5416b(a)(1)(i) (requiring initial inspection only *after* January 22, 2027).

In short, rather than revert to the prior "no detectable emissions" standard, or some other temporary measure, EPA rendered closed-vent systems' performance standard completely unenforceable until 2027. The delay effectively imposes laxer requirements on closed-vent systems at new sources subject to the 2024 Rule compared to older sources that are subject to earlier regulations for this sector. *See* 40 C.F.R. § 60.5416; *id.* § 60.5416a. EPA has thus utterly failed to "adequately explain[] the basis for" delaying the requirements for closed-vent systems. *McGregor Printing Corp.*, 20 F.3d at 1194.

Second, even if operators' concerns were legitimate, they still would not support EPA's action here. EPA averred that the delay is necessary because operators may be unable to meet "the compliance schedule in the 2024 final rule." 90 Fed. Reg. at 55676. But if leaks were "inevitable," no amount of additional

55

compliance time would solve that problem.[25] The Agency's decision thus lacks "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

### J.  Annual Compliance Report Deadline.

The 2024 Rule required operators to submit their initial compliance reports by August 2025. For the first time in the Delay Rule, EPA extended this deadline to November 30, 2026, purporting to "agree[]" with commenters "that there was confusion with respect to how the 2025 [Interim Final Rule] impacted the annual compliance reports." 90 Fed. Reg. at 55679. This explanation is unsupported by the record and lacks a rational connection to the underlying facts.

After issuing the Interim Final Rule, EPA made clear on its website that the reporting deadline extension applied to only a limited set of requirements. *See, e.g.*, *id.* (noting webpage explanation that "the reporting deadlines associated with these [Interim Final Rule] compliance deadlines were also extended"). In the Delay Rule, EPA has now claimed that a fourteen-month delay is needed for *all* reporting deadlines, not just those affected by a changed compliance deadline. EPA asserted that operators needed "time to remove certain information" related to the Delay

---

[25] Again, if EPA is simply buying time to reconsider the underlying standard, such a stay is subject to strict limits—limits that EPA has violated—under section 307(d)(7)(B). *See supra* Section II.

Rule's provisions from their annual report, *id.*, but did not explain why removal would be necessary; upon receipt of an over-inclusive report, EPA could just disregard the unnecessary information.

Further, the comments EPA cites did not even discuss confusion with respect to the Delay Rule. *See id*. at 55679 n.30. Instead, commenters requested an extension because they believe EPA should "pause enforcement of rules under review,"—*i.e.*, rules under reconsideration. JA_____[EPA-HQ-OAR-2025-0162-0037_2] (Berexco Comment (Aug. 22, 2025)); *see also, e.g.*, JA_____[EPA-HQ-OAR-2025-0162-0168_4] (Ballard Comment (Oct. 2, 2025)) ("[O]ngoing *reconsideration measures* and announcements have created confusion." (emphasis added)). Such a stay pending reconsideration is subject to strict time limits, which EPA has not observed here. *See supra* Section II. These concerns cannot justify the deadline extension, nor can EPA invent "confusion" with respect to the Delay Rule as a pretext for its action.

### K. State Plans.

Existing sources, which make up the "vast majority" of the facilities in the oil and gas sector, 86 Fed. Reg. at 63152, are not subject to any emission limits until states adopt state plans (or EPA adopts a federal plan for states without approved plans of their own). In the Delay Rule, EPA failed to justify, with record evidence, its departure from its original position that two years is the appropriate

timeframe for states to develop and submit state plans. In this regard, the Delay Rule is plainly arbitrary and capricious.

In the proposal for the 2024 Rule, EPA originally included an eighteen-month deadline for state plan submissions. 87 Fed. Reg. at 74831. But EPA finalized a two-year state plan deadline in light of comments arguing that eighteen months was insufficient. 89 Fed. Reg. at 17010. Considering the relevant evidence, EPA found that the two-year timeline would "be adequate to complete state administrative processes, conduct public hearings, engage with pertinent stakeholders, and meet all other applicable requirements." *Id.* Furthermore, EPA determined that the two-year timeline "strikes an appropriate balance" between states' needs and the need for "expeditious implementation in consideration of the important benefits of the pollution reductions." *Id.*

EPA has now extended the state plan deadline by a further ten months, disregarding the careful balancing it conducted for the 2024 Rule and ignoring the air pollution and public health implications of the delay in curbing emissions from existing sources. *See supra* Section I. The Agency has failed to explain why "expeditious implementation" and the resulting benefits are no longer important. 89 Fed. Reg. at 17010. This omission is particularly glaring because, as EPA concedes, the state plans will be responsible for the substantial majority of emission reductions achieved through the 2024 Rule. *See* JA_____,_____[EPA-

HQ-OAR-2021-0317-4021_1-13 tbl. 1-4, 1-14 tbl.1-5] (2024 Rule Regulatory

Impact Analysis (Dec. 2023)). EPA has thus also "entirely failed to consider an

important aspect of the problem"—the problem of air pollution and public health

harms caused by a delay. *Am. Lung Ass'n,* 985 F.3d at 993 (quoting *State Farm*,

463 U.S. at 43).

EPA's action also lacks adequate record support. The Agency claims that its

delay decision is based on "ongoing and recent communications with

stakeholders." 90 Fed. Reg. at 55679. In particular, EPA asserts that one state

"informally" asked the applicable EPA Region for an extension and that some other

unspecified number of states "have been inquiring as to the consequences of late

state plan submissions." 90 Fed. Reg. at 35977.[26] But no evidence of these

communications is included in the record. *See Small Refiner*, 705 F.2d at 511

(vacating rule that was "not supported by the evidence in the record"). And no state

filed a petition for reconsideration or other formal request to modify the deadline.

90 Fed. Reg. at 35977. Nor are these unsupported, vague assertions sufficient to

serve as the basis to overturn EPA's prior findings that two years would provide

---

[26] If a state fails to submit a plan, EPA has one year to implement a federal plan for the state. 40 C.F.R. § 60.27a(c). But EPA does not need to prepare a federal plan if the state issues, and EPA approves, a state plan before EPA issues the federal plan. *Id.* EPA anticipates that around fifteen states will rely on EPA to issue a federal plan. 90 Fed. Reg. at 35978 tbl. 2.

adequate time. *See In re NTE Conn.*, 26 F.4th at 988 (explaining that agency may not "simply summarize[]" comments and then "announce[]" that it "was persuaded") (quotation omitted).

Although EPA lists "challenges" that it claims (without support) an unspecified number of states are facing, it cites no evidence showing that states were unable to meet the two-year deadline despite best efforts. 90 Fed. Reg. at 35979. The only evidence EPA does cite shows that it has provided states with information summarizing the requirements for state plans and providing answers to frequently asked questions. *Id.* Likewise, numerous states have been working closely with EPA's Office of Air Quality Planning and Standards to resolve issues. *Id.* Neither of these factors support the Delay Rule's ten-month extension.

EPA also failed to consider contrary evidence in the record. *See Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009). Petitioners and a coalition of seventeen states plus the District of Columbia provided comments showing that states such as Texas, Utah, Wyoming, California, Colorado, Pennsylvania, and Maine have taken steps toward completing their state plans. JA_____[EDF Comment_28-29]; JA_____-_____[EPA-HQ-OAR-2025-0162-0186_17-18] (California Comment (Oct. 3, 2025)). EPA entirely fails to respond to these comments showing "on the ground evidence" of state progress. JA_____-_____,_____[RTC_46-47, 49].

\*   \*   \*

For each of the foregoing standards, EPA's Delay Rule is unsupported by adequate explanation or record evidence, and vacatur is warranted.

## CONCLUSION

The Delay Rule should be vacated in its entirety.

DATED: June 3, 2026

Respectfully submitted,

_s/ Margaret A. Coulter_
Margaret A. Coulter
Jason C. Rylander
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, D.C. 20005
(202) 961-4820
mcoulter@biologicaldiversity.org
jrylander@biologicaldiversity.org

_Counsel for Center for Biological Diversity_

_/s/ Darin Schroeder_
Darin Schroeder
Mary Y. Sasso
Francis W. Sturges, Jr.
Clean Air Task Force
114 State St., 6th Floor
Boston, MA 02109
(617) 624-0234
dschroeder@catf.us
msasso@catf.us
fsturges@catf.us

_Counsel for Earthworks_

_/s/ Grace M. Smith_
Grace M. Smith
Rosalie Winn
Edwin LaMair
Leah Fattor
Peter Zalzal
Vickie Patton
Environmental Defense Fund
2060 Broadway, Ste. 300
Boulder, CO 80302
(303) 447-7560
gsmith@edf.org
rwinn@edf.org
elamair@edf.org
lfattor@edf.org
pzalzal@edf.org
vpatton@edf.org

Sean H. Donahue
Keri R. Davidson
Donahue, Goldberg, Herzog, & Davidson
1008 Pennsylvania Ave., SE
Washington, D.C. 20003
(202) 277-7085
sean@donahuegoldberg.com
keri@donahuegoldberg.com

/s/ Wendy Bloom
Wendy Bloom
Max Lopez
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
(312) 673-6500
wbloom@elpc.org
mlopez@elpc.org

*Counsel for Environmental Law &
Policy Center*

/s/ Meredith Hankins
Meredith Hankins
David Doniger
Abirami Vijayan*
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, D.C. 20005
(646) 448-3818
mhankins@nrdc.org
*Not admitted in District of
Columbia.

*Counsel for Natural Resources
Defense Council*

*Counsel for Environmental
Defense Fund*

/s/ Alexandra O. Schluntz
Alexandra O. Schluntz
Robin Cooley
Earthjustice
1125 17th Street #1010
Denver, CO 80202
(303) 996-9612
aschluntz@earthjustice.org
rcooley@earthjustice.org

*Counsel for Clean Air Council,
Dakota Resource Council, Food &
Water Watch, Fort Berthold
Protectors of Water & Earth Rights,
and GreenLatinos*

/s/ Andres Restrepo
Andres Restrepo
Sierra Club
50 F St., NW, Eighth Floor
Washington, D.C. 20001
(856) 240-0964
Andres.Restrepo@sierraclub.org

*Counsel for Sierra Club*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), undersigned counsel hereby certifies that the foregoing brief contains 12,984 words, as counted by counsel's word processing system, and thus complies with the 13,000-word limit.

Further, this document complies with the typeface and type-style requirements of the Federal Rules of Appellate Procedure, 32(a)(5) and (a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 using size 14 Times New Roman font.

Dated: June 3, 2026

*/s/ Grace M. Smith*
Grace M. Smith

# CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of June, 2026 I filed the foregoing brief on Respondents with the Court's CMS/ECF system, which will provide copies to counsel of record.

*/s/ Grace M. Smith*
Grace M. Smith