IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

ENVIRONMENTAL DEFENSE FUND, *et al.*

*Petitioners,*

— v. —

LEE ZELDIN, *et al.*

*Respondents.*

On Petition for Review of a Final Action of the United States
Environmental Protection Agency, 90 Fed. Reg. 55,671 (Dec. 3, 2025)

## BRIEF OF THE INSTITUTE FOR POLICY INTEGRITY AT NEW YORK UNIVERSITY SCHOOL OF LAW AS *AMICUS CURIAE* IN SUPPORT OF PETITIONERS

Max Sarinsky
Erin Shortell
INSTITUTE FOR POLICY INTEGRITY
139 MacDougal Street, 3rd Floor
New York, NY 10012
(212) 992-8932
max.sarinsky@nyu.edu

*Counsel for* Amicus Curiae
*Institute for Policy Integrity*

June 10, 2026

# CIRCUIT RULE 28(A)(1) STATEMENT

As required by Circuit Rule 28(a)(1), counsel for the Institute for Policy Integrity at New York University School of Law certify as follows:

(1)     All parties, amici, and intervenors appearing in this case are listed in Petitioners' opening brief.

(2)     References to the final agency action under review appear in Petitioners' opening brief.

(3)     Related and consolidated cases appear in Petitioners' opening brief.

## RULE 26.1 DISCLOSURE STATEMENT

The Institute for Policy Integrity (Policy Integrity) is a nonpartisan, not-for-profit organization at New York University School of Law.[*] No publicly held entity owns an interest in Policy Integrity. Policy Integrity does not have any members who have issued shares or debt securities to the public.

---

[*] This brief does not purport to represent the views, if any, of New York University School of Law.

# TABLE OF CONTENTS

**Page**

CIRCUIT RULE 28(A)(1) STATEMENT .......................................................i

RULE 26.1 DISCLOSURE STATEMENT.................................................. ii

TABLE OF AUTHORITIES.................................................................iv

GLOSSARY OF ACRONYMS AND ABBREVIATIONS......................... vii

INTEREST OF *AMICUS CURIAE* ....................................................1

SUMMARY OF ARGUMENT..............................................................3

ARGUMENT ...................................................................................5

    I.    There Is No Carveout To Reasoned Decisionmaking For Delay Rules....................................................................5

    II.   EPA Arbitrarily Disregarded The Final Rule's Adverse Climate Effects From Lost Reductions In Methane Emissions. .................................................................. 7

        A.    The Final Rule's preamble barely mentions, let alone considers, the Final Rule's climate harms.......... 7

        B.    EPA grossly undercounted the methane emissions attributable to the Final Rule................................... 10

        C.    EPA arbitrarily ignored its own tool to estimate the scale of climate impacts....................................... 12

            1.    Valuing climate impacts is well established in economics and regulatory practice. ................... 13

            2.    EPA's climate-damage estimates already addressed the uncertainties that EPA now cites to justify discarding them.......................... 16

        D.    EPA failed to weigh the Final Rule's costs against its benefits, despite persuasive evidence that climate damages exceed compliance cost savings. ...... 25

    III.   EPA Also Overlooked The Adverse Health Impacts From Increased Volatile Organic Compound Emissions. ....28

CONCLUSION.................................................................................32

CERTIFICATE OF COMPLIANCE

**Page(s)**

**Cases**

*Air All. Houston v. EPA*, 906 F.3d 1049 (D.C. Cir. 2018) ....................5, 6

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
   538 F.3d 1172 (9th Cir. 2008) ..................................................... 13, 24

*Env't Def. Fund, Inc. v. EPA*, 716 F.2d 915 (D.C. Cir. 1983) ...................5

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .................6, 28

*Michigan v. EPA*, 576 U.S. 743 (2015) ...........................................6, 7, 28

*Motor Vehicle Manufacturers Ass'n of the United States, Inc., v. State
   Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ................................6, 28

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209 (D.C.
   Cir. 2004) ...............................................................................................24

**Executive and Regulatory Documents**

EPA, *Affirmation of Economic Impact Analysis for the Interim Final
   Rule* (2025).............................................................................................9

EPA, *Economic Impact Analysis for the Extension of Deadlines in the
   NSPS OOOOb and EG OOOOc* (2025) ...............................................
   ................................... 9, 10, 11, 15, 16, 17, 18, 19, 20, 21, 24, 26, 30, 31

EPA, Environmental Benefits Mapping and Analysis Program–
   Community Edition User's Manual (2025), https://perma.cc/6TFX-
   JXNT.....................................................................................................31

EPA, Final Comments Summary Report  (2023),
   https://perma.cc/YK5G-F4UF ............................................... 15, 18, 22

EPA, *Guidelines for Preparing Economic Analyses* (3d ed. 2024)..........23

EPA, Regulatory Impact Analysis of the Standards of Performance for
   New, Reconstructed, and Modified Sources and Emissions Guidelines
   for Existing Sources: Oil and Natural Gas Sector Climate Review
   (2023) .............................................................................................31, 32

EPA, *Report on the Social Cost of Greenhouse Gases: Estimates Incorporating Recent Scientific Advances* (2023) ...................................
.........................2, 13, 14, 17, 18, 19, 20, 21, 22, 23, 25, 27

EPA, Response to Public Comments on the July 31, 2025 Interim Final Rule (2025)...............................................................8, 11, 28

Exec. Order No. 13,783 §§ 5(b)–(c), 82 Fed. Reg. 16,093, 16,095–96 (Mar. 28, 2017) .................................................14

Interagency Working Grp. on Soc. Cost of Greenhouse Gases, *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide* (2021).................................................13, 14

Off. of Mgmt. & Budget, *Circular A-4: Regulatory Analysis* (2003)...........
...............................................................21, 23

Off. of Mgmt. & Budget, *Circular A-4: Regulatory Analysis* (2023).......21

Oil and Natural Gas Sector Climate Review: Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources, 90 Fed. Reg. 55,671 (Dec. 3, 2025) .................................................8, 30

Request for Nominations of Experts, 87 Fed. Reg. 3801 (Jan. 25, 2022)
...............................................................15

Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review, 89 Fed. Reg. 16,820 (Mar. 8, 2024) .................................8, 14, 15, 23, 25, 26, 29, 31

## Other Authorities

Corinne Hartin et al., *Advancing the Estimation of Future Climate Impacts Within the United States*, 14 EARTH SYS. DYNAM. 1015 (2023)
...............................................................21

Inst. for Pol'y Integrity, Comments on Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources (Oct. 1, 2025)
...............................................................2, 16, 27

Nat'l Acads. of Scis., Eng'g & Med., *Valuing Climate Damages: Updating Estimation of the Social Cost of Carbon Dioxide* (2017) ................................................................................................ 17, 19, 22

Richard L. Revesz & Michael A. Livermore, *Retaking Rationality: How Cost-Benefit Analysis Can Better Protect the Environment and Our Health* (Oxford Univ. Press, 2008)........................................................1

*William D. Nordhaus*, THE NOBEL PRIZE, https://perma.cc/L7W5-C6HT ............................................................................................. 13

# GLOSSARY OF ACRONYMS AND ABBREVIATIONS

Pursuant to Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this brief:

| | |
|---|---|
| 2024 Rule | Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review, 89 Fed. Reg. 16,820 (Mar. 8, 2024) |
| EPA | Environmental Protection Agency |
| Final Rule | Oil and Natural Gas Sector Climate Review: Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources, 90 Fed. Reg. 55,671 (Dec. 3, 2025) |
| Interim Rule | Extension of Deadlines In Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review Final Rule, 90 Fed. Reg. 35,966 (July 31, 2025) |
| National Academies | National Academies of Sciences, Engineering, and Medicine |
| VOC | Volatile organic compound |

**INTEREST OF *AMICUS CURIAE***

The Institute for Policy Integrity at New York University School of Law (Policy Integrity) is a nonpartisan, not-for-profit think tank dedicated to improving the quality of government decisionmaking through advocacy and scholarship in administrative law, economics, and public policy, focusing primarily on environmental issues.[1]

Policy Integrity has produced extensive scholarship on engaging in balanced economic analysis in agency decisionmaking. Our faculty director, Professor Richard L. Revesz, is among the nation's most cited administrative and environmental law scholars, having published more than 100 academic articles and books. *E.g.*, Richard L. Revesz & Michael A. Livermore, *Retaking Rationality: How Cost-Benefit Analysis Can Better Protect the Environment and Our Health* (Oxford Univ. Press, 2008).

Much of Policy Integrity's work focuses on valuing the impacts of climate change. Our economics director, Dr. Peter Howard, is one of the nation's leading experts on valuing climate-change effects. Government

---

[1] Per Federal Rule of Appellate Procedure 29(a)(4)(E), no party's counsel authored this brief wholly or partly, and no person contributed money intended to fund its preparation or submission.

bodies have widely applied his work: For example, the Environmental Protection Agency (EPA) previously used his research to estimate the monetized harm from emitting greenhouse gases. EPA, *Report on the Social Cost of Greenhouse Gases: Estimates Incorporating Recent Scientific Advances* (2023) (EPA SC-GHG Report).

The final rule at issue here (Final Rule)—which extends compliance deadlines for EPA's performance standards for greenhouse gases and volatile organic compounds from crude oil and natural gas sources (2024 Rule)—directly implicates this institutional expertise. Policy Integrity filed comments on the rule's interim final version (Interim Rule) that criticized EPA's disregard for climate effects. Inst. for Pol'y Integrity, Comments on Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources (Oct. 1, 2025), JA___ (Policy Integrity Comments).

We submit this brief to aid the Court in evaluating Petitioners' argument that EPA's consideration of the Final Rule's climate and health harms was arbitrary and capricious.

## SUMMARY OF ARGUMENT

EPA's limited analysis of the Final Rule's climate and health effects violates the Administrative Procedure Act's standards of reasonable decisionmaking.

**I.** Under longstanding precedent, EPA needed to meaningfully consider the Final Rule's effects—just as it would when issuing any rule. EPA also needed to cogently explain its departures from the 2024 Rule. EPA met neither of these requirements.

**II.** Take climate effects. For starters, the Final Rule's preamble hardly mentions the delay's climate impacts, despite the extensive discussion of climate effects in the 2024 Rule's preamble.

The Final Rule's accompanying economic analysis is also inadequate and flawed for three independent reasons. First, EPA significantly understated the Final Rule's effect on methane emissions. Of particular note, EPA arbitrarily omitted the 2024 Rule's anticipated emissions reductions for 2039, while counting the Final Rule's anticipated emissions reductions for the same year. Based on this imbalanced treatment, EPA concluded that the Final Rule would lead to

only 1.3 million more tons of methane emissions compared to the 2024 Rule, when it would actually lead to at least 3.8 million more tons.

Second, EPA declined to value the Final Rule's methane emissions increases (compared to the 2024 Rule), pointing in a single paragraph to uncertainty to justify this choice. But EPA had already thoroughly grappled with that same uncertainty in issuing the 2024 Rule, explaining in hundreds of pages why it was not a barrier to valuing the 2024 Rule's climate impacts. Given that record, EPA cannot now use a vague appeal to uncertainty as a blanket excuse for ignoring an important effect of the Final Rule.

Third, EPA failed to compare the Final Rule's benefits and costs at all. Yet such a comparison reveals that the Final Rule does much more harm than good, as the climate damages it inflicts on society are, at a minimum, roughly three times its cost savings to industry.

**III.** Similar shortcomings undermine EPA's analysis of health impacts from the Final Rule's increases in volatile organic compound (VOC) emissions. The Final Rule's preamble barely acknowledges the premature deaths and illnesses that the delay will cause. As for the Final Rule's economic analysis, it also significantly undercounts the delay's

VOC emissions increases and gives no valid reason for declining to quantify and value the associated illnesses and premature deaths. These unaccounted-for health impacts further increase the Final Rule's adverse impacts.

## ARGUMENT

### I. There Is No Carveout To Reasoned Decisionmaking For Delay Rules.

Earlier in this litigation, EPA appeared to suggest that it need not "weigh health and environmental impacts" when delaying a rule issued under Section 111 of the Clean Air Act. EPA Opposition to Second Motion for Summary Vacatur at 14–15 (Feb. 6, 2026). That argument is wrong.

This is because "[t]he suspension or delayed implementation of a final regulation normally constitutes substantive rulemaking" under the Administrative Procedure Act. *Env't Def. Fund, Inc. v. EPA*, 716 F.2d 915, 920 (D.C. Cir. 1983). Accordingly, standards of rational decisionmaking apply. In fact, this Court applied them to another EPA delay rule just a few years ago. *Air All. Houston v. EPA*, 906 F.3d 1049, 1066 (D.C. Cir. 2018). And that makes sense: Otherwise, an agency could evade reasoned decisionmaking altogether by continually prolonging compliance deadlines—which would be tantamount to a repeal.

When delaying a rule's compliance deadlines, an agency must therefore "examine the relevant data and articulate a satisfactory explanation for its action" that meaningfully considers all "important aspect[s] of the problem." *Motor Vehicle Manufacturers Ass'n of the United States, Inc., v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Air. All. Houston*, 906 F.3d at 1066 (applying the *State Farm* standard to a delay rule). As with any other rule, the agency must rationally consider the forgone (or lost) benefits of the delayed rule—in other words, the delay's costs—and ensure that the delay does not do "significantly more harm than good." *See Michigan v. EPA*, 576 U.S. 743, 752–53 (2015). And the agency must cogently explain any "departure from its previous conclusions." *Air All. Houston*, 906 F.3d at 1067–68; *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).

As explained in Parts II and III, *infra*, EPA failed to meet these standards of reasoned decisionmaking in the Final Rule, most notably with respect to the Final Rule's adverse climate and health effects.

## II. EPA Arbitrarily Disregarded The Final Rule's Adverse Climate Effects From Lost Reductions In Methane Emissions.

In extending the 2024 Rule's compliance deadlines, the Final Rule fails to rationally consider the delay's adverse climate impacts in four ways. First, the Final Rule's preamble makes no attempt to consider the delay's climate effects—a shortcoming made even more blatant given the extensive discussion of these effects in the 2024 Rule's preamble. Turning to the Final Rule's economic analysis, EPA committed three more errors: (2) substantially undercounting the lost reductions in methane emissions; (3) declining to value those lost reductions; and (4) failing to compare the Final Rule's benefits and costs.

Simply put, the Final Rule "does significantly more harm than good," *Michigan*, 576 U.S. at 752: Based on EPA's own climate-damage estimates (which EPA now arbitrarily declines to apply), the Final Rule imposes over $2 billion in climate costs to save industry $750 million.

### A. The Final Rule's preamble barely mentions, let alone considers, the Final Rule's climate harms.

In the Final Rule's preamble, EPA effectively ignored the lost reductions in methane emissions that the Final Rule will cause and the climate harms associated with these lost reductions. Tellingly, the Final

7

Rule's preamble never uses the word "climate" except when stating the 2024 Rule's and Interim Rule's full titles. *See generally* Oil and Natural Gas Sector Climate Review: Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources, 90 Fed. Reg. 55,671 (Dec. 3, 2025, JA___ (Final Rule). Moreover, EPA hardly responded to comments that criticized its failure to consider climate effects in the Interim Rule. *See, e.g.*, EPA, Response to Public Comments on the July 31, 2025 Interim Final Rule 13 (2025), JA___ (Response to Comments) (stating in conclusory terms that emissions impacts "were considered"); *id.* at 45, JA___ (indicating that adverse impacts from methane emissions are "beyond the scope of this action").

These omissions are all the more glaring when juxtaposed against the extensive analysis of climate effects in the 2024 Rule's preamble. The 2024 Rule's primary purpose was to "mitigate climate-destabilizing pollution and protect human health," principally by reducing methane emissions. Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review, 89 Fed. Reg. 16,820, 16,823 (Mar. 8,

2024) (2024 Rule). In the 2024 Rule, EPA extensively discussed the benefits of reducing methane emissions. *See, e.g., id.* at 16,836–41. It concluded that, by avoiding 58 million tons of methane emissions through 2038, the 2024 Rule would prevent at least $110 billion in climate damages. *Id.* at 16,836 tbls. 5 & 6, 17,018. EPA also modeled and carefully considered the 2024 Rule's compliance costs, *id.* at 16,836 tbl. 6, 17,017–18, but found that the climate benefits alone outweighed net compliance costs by more than five to one, *see id.* at 16,836 tbl. 6.

In the Final Rule, EPA thus made a 180-degree turn regarding climate effects without meaningfully explaining its reasons or engaging with the 2024 Rule's thorough analysis. To be sure, EPA prepared an economic analysis that purported to assess the climate harms from delaying the 2024 Rule's compliance deadlines. EPA, *Economic Impact Analysis for the Extension of Deadlines in the NSPS OOOOb and EG OOOOc* (2025), JA___ (Economic Impact Analysis).[2] But, as detailed in the following subsections, that economic analysis does not meaningfully consider the Final Rule's climate harms either.

---

[2] EPA published this economic analysis with the Interim Rule, and reaffirmed the analysis in issuing the Final Rule. EPA, *Affirmation of Economic Impact Analysis for the Interim Final Rule* (2025), JA___.

**B.**   **EPA grossly undercounted the methane emissions attributable to the Final Rule.**

The Final Rule's economic analysis substantially undercounts the lost reductions in methane emissions from delaying the 2024 Rule's compliance deadlines. Petitioners note that EPA failed to quantify the lost reductions in methane emissions from extending the deadlines for new sources. Pet'r's Br. 25–26. As detailed in this section, EPA also significantly undercounted the lost reductions in methane emissions from delaying the existing-source standards: Instead of 1.3 million tons, EPA should have counted at least 3.8 million tons of lost reductions in methane emissions. In other words, based on the 2039 issue alone, the Final Rule results in at least 3.8 million *more* tons of methane emissions than if the 2024 Rule's existing-source standards had not been delayed.

This error stems from EPA's inconsistent accounting choices in the Final Rule. As the following table excerpted from EPA's economic analysis demonstrates, EPA assumed equal emissions reductions (compared to a baseline with neither rule) under both the Final Rule and the 2024 Rule from 2029 through 2038. Economic Impact Analysis, *supra*, at 6 & tbl. 3, JA___. For 2039, however, EPA applied different assumptions to the Final Rule and the 2024 Rule. For the Final Rule,

EPA assumed 2.5 million tons of emissions reductions. *Id.* at 6 n.10 & tbl. 3, JA___. But for the 2024 Rule, EPA ended the analysis in 2038—effectively assuming *zero* emissions reductions in 2039. *Id.* at 6 tbl. 3, JA___.[3] This inconsistency in the Final Rule's analysis is inexplicable because the 2024 Rule would have produced the same reductions in 2039 as the Final Rule.

**Table 3: Estimated Annual Stream of Emissions Reductions under the 2024 Final Rule and the IFR, 2028–2039 (short tons)**

| | Methane | |
| --- | --- | --- |
| Year | *2024 Final Rule* | *IFR* |
| *2028* | 3,800,000 | - |
| *2029* | 3,700,000 | 3,700,000 |
| *2030* | 3,500,000 | 3,500,000 |
| *2031* | 3,400,000 | 3,400,000 |
| *2032* | 3,300,000 | 3,300,000 |
| *2033* | 3,200,000 | 3,200,000 |
| *2034* | 3,000,000 | 3,000,000 |
| *2035* | 2,900,000 | 2,900,000 |
| *2036* | 2,800,000 | 2,800,000 |
| *2037* | 2,700,000 | 2,700,000 |
| *2038* | 2,600,000 | 2,600,000 |
| *2039* | - | 2,500,000 |
| *Total* | 35,000,000 | 34,000,000 |
| *Additional Emissions* | | 1,300,000 |

Citation: Economic Impact Analysis, *supra*, at 6 tbl. 3, JA___. For clarity, right-hand columns not discussed in this section have been removed.

Had EPA applied the same approach to both the Final Rule and the 2024 Rule (that is, either adding 2.5 million tons for 2039 or stopping the

---

[3] When pressed by a commenter to explain this discrepancy, EPA failed to cogently do so. *See* Response to Comments, *supra*, at 35, JA___ (referring to the "analysis horizon").

analysis at 2038), it would have counted 2.5 million more tons of lost reductions in methane emissions from the Final Rule. Instead of estimating 1.3 million tons of lost reductions in methane (that is, additional emissions), EPA should have counted at least 3.8 million— nearly three times the Final Rule's estimated amount.

### C. EPA arbitrarily ignored its own tool to estimate the scale of climate impacts.

Properly counting methane emissions is only part of the equation. For nearly two decades, EPA has also valued greenhouse gas emissions using an economic tool known as the social cost of greenhouse gases. With the 2024 Rule, EPA published hundreds of pages of analysis explaining that approach and responding to peer review and public comments.

In delaying the 2024 Rule, EPA broke from its longstanding practice and declined to value the Final Rule's climate harms, deeming its prior climate-damage estimates too uncertain. It explained this important change in just three sentences that contradicted its prior findings.

### 1. Valuing climate impacts is well established in economics and regulatory practice.

The social cost of a greenhouse gas reflects the estimated "monetary value of the net harm to society from emitting a metric ton of that [gas] into the atmosphere." EPA SC-GHG Report, *supra*, at 1. It enables regulators to compare a rule's climate impacts to other monetized effects such as compliance costs. *See id.*

The first climate-damage estimates date back to the 1990s, *see id.* at 6 & n.12, with Yale University professor Dr. William Nordhaus earning the Nobel Prize in Economics for that work, *William D. Nordhaus*, THE NOBEL PRIZE, https://perma.cc/L7W5-C6HT. Federal agencies started using these values after the U.S. Court of Appeals for the Ninth Circuit found a rule arbitrary and capricious because the agency had failed to value the rule's climate impacts. Interagency Working Grp. on Soc. Cost of Greenhouse Gases, *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide* 2 (2021), https://perma.cc/DQQ4-X98H; *see also Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1198–1203 (9th Cir. 2008).

In response to this decision, the White House convened an interagency working group in 2009 to "ensure that agencies were using the best available science and to promote consistency in the values used across agencies." Interagency Working Grp. on Soc. Cost of Greenhouse Gases, *supra*, at 2. This working group released its first estimates in 2010 and periodically updated them to reflect scientific and economic advances. *Id.* at 2. Across three presidential administrations—including the first Trump Administration[4]—agencies valued the climate impacts of their rules. EPA SC-GHG Report, *supra*, at 8–9.

As part of the 2024 Rule docket, EPA updated its climate-damage values to reflect the latest economic and scientific advances and incorporate recommendations from the National Academies of Sciences, Engineering, and Medicine (National Academies). *Id.* at 1; *see also* 2024 Rule, 89 Fed. Reg. at 16,835. EPA carefully ensured the rigor and impartiality of its estimates. It took public comment on its draft estimates and subjected them to peer review. EPA SC-GHG Report,

---

[4] The first Trump administration disbanded the working group and withdrew its publications. Exec. Order No. 13,783 §§ 5(b)–(c), 82 Fed. Reg. 16,093, 16,095–96 (Mar. 28, 2017). But it continued monetizing climate impacts with revised estimates of the social cost of greenhouse gases that amended certain parameters.

*supra*, at 3 & n.1; 2024 Rule, 89 Fed. Reg. at 16,835. To choose peer reviewers, EPA requested nominations from the public and tasked an independent contractor with the selection, Request for Nominations of Experts, 87 Fed. Reg. 3801, 3802 (Jan. 25, 2022), which yielded seven eminently qualified experts, *see* EPA, Final Comments Summary Report 4 (2023), https://perma.cc/YK5G-F4UF (Peer Review Report) (listing reviewers' qualifications).

As explained further below, EPA's estimates incorporated the best available science and economics. *See infra* Part II.C.2. The expert peer reviewers lauded the estimates as a "huge advance," *id.* at 7 (comments of Dr. Maureen Cropper), and a "significant step," *id.* at 9 (Dr. Chris Forest), emphasizing that they "advanc[e] our state of knowledge," *id.* at 14 (Dr. Wolfram Schlenker), and "represent[] well the emerging consensus in the literature," *id.* at 15 (Dr. Gernot Wagner).

Applying these estimates to the 2024 Rule, EPA concluded that the rule would avert $110 billion in climate damages. 89 Fed. Reg. at 16,836 tbls. 5 & 6. Yet in delaying that rule's compliance deadlines, EPA declined to value the Final Rule's climate impacts at all. Economic Impact Analysis, *supra*, at 10, JA___. As detailed below, it provided a

barebones explanation for this about-face that disregarded its extensive analysis in the 2024 Rule.

### 2. EPA's climate-damage estimates already addressed the uncertainties that EPA now cites to justify discarding them.

EPA spent just a paragraph of the Final Rule's economic analysis explaining why it discarded its own analytical tool. According to EPA now, valuing increased methane emissions "could potentially result in flawed decision-making due to overreliance on highly uncertain values." Economic Impact Analysis, *supra*, at 10, JA___. But the climate-damage estimates that EPA used in the 2024 Rule already rigorously addressed uncertainty.

To support its current claim, EPA briefly notes six sources of uncertainty in the social cost of greenhouse gases. *Id.* In comments submitted in response, Policy Integrity detailed how the climate-damage estimates that EPA used in the 2024 Rule extensively accounted for each uncertainty and how uncertainty in fact counsels for higher damage values. Policy Integrity Comments, *supra*, at 5–7, JA___–___; *see generally id.* app. A, JA___. This section briefly summarizes those comments, discussing each uncertainty in turn.

First, in the Final Rule's economic analysis, EPA notes uncertainty around "the magnitude of the change in climate due to a change in [greenhouse gas] emissions," Economic Impact Analysis, *supra*, at 10, JA\_\_\_, even though its own prior climate-damage estimates robustly evaluated that uncertainty. Specifically, the 2024 Rule's estimates used a widely accepted model developed at Oxford University, called the Finite Amplitude Impulse Response model, that is recognized for its ability to capture uncertainty. EPA SC-GHG Report, *supra*, at 35–36; *see also* Nat'l Acads. of Scis., Eng'g & Med., *Valuing Climate Damages: Updating Estimation of the Social Cost of Carbon Dioxide* 13–14 (2017) (National Academies Report). The model captures uncertainty by generating probability distributions for key variables. In other words, it identifies the likelihood of the variable having each plausible value and incorporates these probabilities into the model. *See* National Academies Report, *supra*, at 93 fig. 4-2, 103 fig. 4-5. Using this model, EPA fully incorporated uncertainty about the relationship between methane emissions and the pace and severity of climate change into its climate-damage estimates. *See, e.g.*, EPA SC-GHG Report, *supra*, at 37–38 & tbls.

17

2.2.1 & 2.2.2 (showing alignment between EPA's results and scientific consensus).

Second, EPA now points to "the relationship between changes in the climate and the economy" as another area of uncertainty, Economic Impact Analysis, *supra*, at 10, JA___, but its own climate-damage estimates accounted for that uncertainty too. In those estimates, EPA used three state-of-the-art "damage functions" developed by preeminent economists to "translate changes in temperature and other physical impacts of climate change into monetized estimates of net economic damages." *See* EPA SC-GHG Report, *supra*, at 45, 47. Together, these damage functions capture numerous harms caused by climate change, including effects on health, energy, labor productivity, agriculture, and coastal regions. *Id*. at 52 tbl. 2.3.1, 55 tbl. 2.3.2. Here, too, EPA accounted for uncertainty: Using three peer-reviewed damage functions, each with a different method for measuring the damages from climate change, ensured analytical rigor. *See id*. at 46–59; *see also* Peer Review Report, *supra*, at 35–36 (praise from Dr. Cropper). In addition, all three models incorporated uncertainty about the relationship between climate change and economic damages—the two primary models through rigorous

statistical techniques, *see* EPA SC-GHG Report, *supra*, at 48, 53, and the third by synthesizing results from 20 other damage functions, *see id.* at 57. These three models all produced similar damage estimates, but in any event, EPA integrated the three modeling results to address any lingering uncertainty among the models. *See id.* at 78–80.

Third, while EPA now flags uncertainty around "future economic and population growth," Economic Impact Analysis, *supra,* at 10, JA___, its own prior climate-damage estimates used advanced statistical techniques to capture this uncertainty. Consistent with the National Academies' recommendations, *see* National Academies Report, *supra,* at 11, EPA used projections developed by leading economists, EPA SC-GHG Report, *supra*, at 23. EPA found that because these projections "represent a state-of-the-art set of probabilistic socioeconomic and emissions scenarios based on high-quality data, robust statistical techniques, and expert elicitation," *id.* at 26, they "capture uncertainty" rigorously, *id.* at 23; *see also id.* at 28 & fig. 2.1.1, 30 & fig. 2.1.2 (visualizing the range of plausible outcomes for economic and population growth).

Fourth, EPA now highlights "future technological advancements that would reduce vulnerability and impacts," Economic Impact

Analysis, *supra*, at 10, JA___, but it already factored such innovations into its prior estimates. Regarding mitigation technologies, the estimates that EPA used in the 2024 Rule incorporated an expert elicitation that assessed the scale of future negative emissions technologies like direct air capture. *See* EPA SC-GHG Report, *supra*, at 25–26; *see also id.* at 33 fig. 2.1.3 (showing uncertainty ranges for global emissions that drop below zero this century). EPA's damage functions also accounted for adaptation across economic sectors. *See id.* at 52 tbl. 2.3.1, 55 tbl. 2.3.2. For example, one damage function included "shifts in workforce composition to less weather-exposed industries" that could affect labor productivity and "retreat or protective infrastructure" like sea walls that could limit damages in coastal regions. *Id.* at 52 tbl. 2.3.1.

Fifth, although EPA now references uncertainty about "the share of impacts from [greenhouse gas] emissions that affect citizens and residents of the United States," Economic Impact Analysis, *supra*, at 10, JA___, EPA also extensively analyzed this issue before. In fact, EPA has previously estimated "the damages from climate impacts physically occurring within" the United States. EPA SC-GHG Report, *supra*, at 95 (highlighting estimates from two of its damage functions); *see also*

20

Corinne Hartin et al., *Advancing the Estimation of Future Climate Impacts Within the United States*, 14 EARTH SYS. DYNAM. 1015, 1016 (2023) (discussing another EPA model that estimates climate damages within the United States). Such estimates capture key "channels through which climate change can affect US citizens and residents . . . yet remain a partial estimate." *See* Hartin et al., *supra*, at 1026 (emphasizing that climate impacts that occur abroad also affect U.S. residents and companies in part due to "the interconnectedness of the global economy"); *see also* EPA SC-GHG Report, *supra*, at 95–96. Even these partial estimates are large. *See, e.g.*, EPA SC-GHG Report, *supra*, at 95 nn.142–43.

Sixth, while EPA now calls out uncertainty about "the appropriate discount rates to use," Economic Impact Analysis, *supra*, at 10, JA___, its prior estimates rigorously accounted for discounting uncertainty too. A discount rate translates impacts that occur at different times into present value, reducing the value of effects that occur later. Off. of Mgmt. & Budget, *Circular A-4: Regulatory Analysis* 75 (2023). Consistent with the Office of Management and Budget's longstanding approach, *see id.* at 76–77; Off. of Mgmt. & Budget, *Circular A-4: Regulatory Analysis* 33–34

21

(2003) (2003 Circular A-4), EPA based its near-term discount rate of 2% on interest rate data (that is, the real return on Treasury yields) from the past 30 years, EPA SC-GHG Report, *supra*, at 67 & n.117. EPA followed the National Academies' recommendation to include a range of discount rates to capture uncertainty. *Id.* at 70; *see also* National Academies Report, *supra*, at 19. Recognizing that the discount rate may fluctuate over time, EPA also used a widely embraced statistical approach called the Ramsey formula to capture the range of plausible long-term discount rates. EPA SC-GHG Report, *supra*, at 64–66; *see also id.* at 72 fig. 2.4.1. In this respect, too, EPA followed the National Academies' recommendation, *see* National Academies Report, *supra*, at 18, and earned praise from expert reviewers, *see, e.g.*, Peer Review Report, *supra*, at 48 (comments of Dr. Karen Fisher-Vanden).

Two last points merit emphasis. To start, EPA has previously found that uncertainty points to higher, not lower, climate-damage values. Perhaps most notably, the damage functions for the climate-damage estimates used in the 2024 Rule focus on the effects of temperature changes, but exclude (1) damages from other effects of climate change such as extreme weather and precipitation and (2) most non-climate-

driven damages from greenhouse gas emissions like health effects of ozone formation caused by methane. *See* EPA SC-GHG Report, *supra*, at 87 tbl. 3.2.1. Due to data and modeling limitations, the damage functions also omit some key climate-driven impacts from temperature change, such as effects on supply chains, migration, wildfires and their smoke, and water access. *Id.* at 87 tbl. 3.2.1; *see also* 2024 Rule, 89 Fed. Reg. at 17,018 (noting that the estimates "implicitly assign[] a value of zero to the omitted climate damages"). As a result, EPA's climate-damage estimates likely "underestimate the marginal damages from [greenhouse gas] emissions." EPA SC-GHG Report, *supra*, at 86; *accord* 2024 Rule, 89 Fed. Reg. at 17,018.

In addition, *all* future projections—not just those involving climate change—are uncertain. Thus, "treatment of uncertainty is an essential component of [any] analysis" that an agency conducts. EPA, *Guidelines for Preparing Economic Analyses* 5-29 (3d ed. 2024). EPA's guidelines instruct the agency to present uncertain outcomes—whether they represent regulatory benefits or costs—"based on expected or most plausible values." *Id.* Interagency guidance contains similar instructions. *E.g.*, 2003 Circular A-4, *supra*, at 40–41. This Court, too, has recognized

that "[r]egulators by nature work under conditions of serious uncertainty, and regulation would be at an end if uncertainty alone were an excuse" not to regulate. *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1221 (D.C. Cir. 2004).

In fact, in the 2008 case that prompted federal agencies to more broadly use climate-damage estimates in the first place (mentioned above), the Ninth Circuit squarely rejected the same uncertainty-based argument that EPA now makes. *Ctr. for Biological Diversity*, 538 F.3d at 1200–01. There, the court emphasized that "the value of carbon emissions reduction is certainly not zero" and that "there is no evidence . . . that the appropriate course was not to monetize or quantify the value of carbon emissions reduction at all." *Id.* Just as in that case, here EPA valued the Final Rule's uncertain compliance cost savings—yet for climate damages, it ignored its prior analysis and threw its hands up. *Compare id.* at 1202 (criticizing the defendant agency for valuing other uncertain regulatory effects but not emissions reductions) *with* Economic Impact Analysis, *supra,* at 5, JA___ (estimating a wide range of total cost savings, while noting uncertainty around the discount rate).

It is difficult to overstate the inadequacy of EPA's current analysis. As noted above, with the 2024 Rule, EPA published hundreds of pages of analysis on valuing climate damages and rigorously incorporated uncertainty. *See* EPA SC-GHG Report, *supra.* Now, in one paragraph, EPA merely flagged already-addressed sources of uncertainty and failed to recognize its previous record. EPA's barebones explanation for disregarding its extensive prior analysis is unreasonable.

### D. EPA failed to weigh the Final Rule's costs against its benefits, despite persuasive evidence that climate damages exceed compliance cost savings.

When issuing the 2024 Rule, EPA properly concluded that the rule's benefits far outweighed its costs. Yet, in the Final Rule, EPA extended the 2024 Rule's compliance deadlines without grappling with its own prior analysis or weighing the Final Rule's beneficial and adverse effects.

As explained above, the 2024 Rule would prevent 58 million short tons of methane emissions through 2038 (the last year of EPA's analysis). 2024 Rule, 89 Fed. Reg. at 16,836 tbl. 5, 17,017. Using the social cost of methane, EPA projected at least $110 billion in climate benefits from the rule. *Id.* at 16,836 tbl. 6, 17,019. On the other side of the ledger, EPA also modeled and considered the rule's net compliance costs, anticipating a

total of $19 billion (using a 2% discount rate, as it did for climate benefits, and taking into account product recovery). *Id.* at 16,836 tbl. 6, 17,017–18.

EPA weighed these benefits and costs in the 2024 Rule, concluding that "the advantages that the rule provides"—in particular, "a substantial and meaningful reduction in methane and [volatile organic compound] pollution, and the associated positive impacts on public health and the natural environment"—"outweigh its disadvantages, namely cost of industry compliance." *Id*. at 16,868. Even setting aside the benefits of reducing volatile organic compound emissions (discussed in Part III, *infra*), the 2024 Rule's climate benefits alone exceeded its net compliance costs by more than five to one. *See id*. at 16,836 tbl. 6.

In the Final Rule, EPA made no attempt to explain why the benefits of extending the 2024 Rule's deadlines justify the costs—and, indeed, they do not. As explained in *supra* Part II.A, EPA hardly even mentioned methane emissions or climate impacts in the Final Rule. And EPA highlighted $750 million in compliance cost savings from the Final Rule without weighing them against the climate harms EPA failed to monetize or properly quantify. *See* Economic Impact Analysis, *supra*, at 2, JA___.

Had EPA applied its own climate-damage values that reflect the best available science and economics—yet still probably understate the true damages from methane emissions, *see supra* Part II.C.2—it would have found that the Final Rule's costs far outweigh its benefits. The Final Rule's estimated 1.3 million tons of additional methane emissions cost society over $2 billion. Policy Integrity Comments, *supra*, at 7. Using the more accurate tally of 3.8 million tons, *see supra* Part II.B, the Final Rule's climate costs rise to over $8 billion. *Id.*[5]

The Final Rule's climate costs alone thus exceed the compliance cost savings by at least roughly three times, and probably much more. Presented with this evidence in comments, EPA cavalierly brushed it

---

[5] Policy Integrity calculated these values as follows. At a minimum, EPA should have found that, compared to the Final Rule, the 2024 Rule avoided an additional 3.8 million short tons (about 3.4 million metric tons) of methane emissions, all occurring in 2028. *See supra* Part II.B. Based on EPA's social cost of methane, EPA SC-GHG Report, *supra*, at 154 tbl. A.5.1, the present value of these avoided emissions is over $8 billion.

As explained in Part II.B, *supra*, EPA erroneously assumed that the Final Rule avoided an additional 2.5 million tons of emissions in 2039. Those emissions are worth around $6 billion, again based on EPA's social cost of methane. Thus, based on EPA's own prior accounting, the Final Rule's climate damages would total over $2 billion ($8 billion minus $6 billion). In both cases, monetary values were adjusted for inflation and discounted back to present value.

away. *See* Response to Comments, *supra*, at 35, JA___ (discrediting its prior climate-damage estimates without meaningful analysis).

The Supreme Court has been clear: "No regulation is appropriate if it does significantly more harm than good." *Michigan*, 576 U.S. at 752 (internal quotation marks omitted). Yet EPA issued a Final Rule that does exactly that.

\* \* \*

EPA violated each of the standards of reasoned decisionmaking outlined in Part I. It failed to meaningfully consider the Final Rule's climate harms—"an important aspect of the problem." *See State Farm*, 463 U.S. at 43. It provided no "reasoned explanation" for discarding its extensive prior analysis. *See Fox*, 556 U.S. at 516. And it issued a rule whose climate costs alone far outweigh its economic benefits. *See Michigan*, 576 U.S. at 752. The Final Rule is arbitrary and capricious many times over.

III. **EPA Also Overlooked The Adverse Health Impacts From Increased Volatile Organic Compound Emissions.**

The Final Rule's climate damages are not the only costs (that is, forgone benefits) EPA failed to consider. The 2024 Rule also required

reductions in volatile organic compound (VOC) emissions, which EPA quantified and valued for their health benefits in its economic analysis. The Final Rule also effectively ignores the harms from delaying these VOC emissions reductions.

VOCs are hazardous air pollutants that cause cancer and other illnesses, and they also contribute to the formation of ozone, which harms human health. 2024 Rule, 89 Fed. Reg. at 16,841. When issuing the 2024 Rule, EPA estimated that the rule would reduce VOC emissions by 16 million tons through 2038, generating $7 billion in health benefits. *Id.* at 16,836 tbls. 5 & 6, 17,019 (valued at a 2% discount rate).

In delaying the 2024 Rule's deadlines, EPA failed to meaningfully consider or weigh these substantial forgone benefits. In every relevant respect, EPA's consideration of the Final Rule's lost reductions in VOC emissions suffers from the same flaws as its limited analysis of the rule's lost reductions in methane emissions.

To begin with, EPA barely mentioned or considered the health harms from the Final Rule's lost reductions in VOC emissions. In the Final Rule's preamble, EPA used the term "VOC" (or "volatile organic compound") just once and discussed negative health impacts from

increased VOC emissions only in summarizing the views of commenters. *See* Final Rule, 90 Fed. Reg. at 55,671–81, JA__–__. In its accompanying economic analysis, EPA similarly minimized the Final Rule's health effects. For the same reasons it underestimated the Final Rule's lost reductions in methane emissions, EPA also undercounted its lost reductions in VOC emissions: Once again, EPA counted lost reductions only from the rule's existing-source provisions and applied inconsistent assumptions when comparing the Final Rule and the 2024 Rule, counting emissions reductions in 2039 only for the Final Rule. *See* Economic Impact Analysis, *supra*, at 6 tbl. 3, JA___; *supra* Part II.B. Had EPA merely applied an evenhanded approach with respect to 2039, it would have calculated nearly three times the lost reductions in VOC emissions from the Final Rule: 960,000 tons, not 350,000. *See* Economic Impact Analysis, *supra*, at 6 tbl. 3, JA___.

In addition, EPA did not quantify or value the health effects from the lost reductions in VOC emissions, despite having used well-established methods to measure the effects of the 2024 Rule's VOC emission reductions. Specifically, in the 2024 Rule, EPA used the "environmental Benefits Mapping and Analysis Program"—a model that

EPA developed in 2003, EPA, Environmental Benefits Mapping and Analysis Program–Community Edition User's Manual 1-1 (2025), https://perma.cc/6TFX-JXNT—to quantify the effect of VOC emissions on premature deaths and illnesses, 2024 Rule, 89 Fed. Reg. at 16,835. EPA found that, in addition to preventing substantial amounts of illness, the 2024 Rule would prevent many premature deaths associated with ozone resulting from VOC emissions—more than 75 per year by 2038. *See* EPA, Regulatory Impact Analysis of the Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review 3-48 tbl. 3-9 (2023) (2024 Rule Regulatory Impact Analysis). EPA valued the lives saved and illnesses avoided at $7 billion. *Id.* at 3-50 tbl. 3-6 (using a 2% discount rate).

In delaying the 2024 Rule, however, the Final Rule now ignores EPA's own well-established methodology, neither quantifying nor valuing the premature deaths and illnesses that the Final Rule will cause. Attempting to justify this omission, EPA states only that "estimated VOC emissions changes in this analysis apply only to the" existing source standards that the 2024 Rule did not separately model.

Economic Impact Analysis, *supra*, at 5, JA___. But that's nonsense. EPA can model health impacts for each provision; it did not do so in the 2024 Rule only because it modeled them in the aggregate, for new and existing sources together. *See* 2024 Rule Regulatory Impact Analysis, *supra*, at 1-13 to 1-15. Unwillingness to use available tools to perform new modeling is not a valid excuse to ignore critical impacts.

Through this error, EPA further disregarded its prior finding that the 2024 Rule's benefits greatly exceeded its costs. As noted above, the climate harms from the Final Rule's lost reductions in methane emissions alone greatly exceed the compliance cost savings. *See supra* Part II.D. Adding to the equation the health impacts from the Final Rule's lost reductions in VOC emissions only further underscores the arbitrariness of EPA's delay.

## CONCLUSION

For the foregoing reasons, this Court should find the Final Rule arbitrary and capricious.

June 10, 2026

Respectfully submitted,

/s/ Max Sarinsky

Max Sarinsky
Erin Shortell
INSTITUTE FOR POLICY INTEGRITY
139 MacDougal Street, 3rd Floor
New York, NY 10012
(212) 992-8932
max.sarinsky@nyu.edu

*Counsel for* Amicus Curiae
*Institute for Policy Integrity*

33

# CERTIFICATE OF COMPLIANCE

This *amicus curiae* brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because this brief contains 6,161 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as counted by counsel's word processing system.

This *amicus curiae* brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

DATED:    June 10, 2026              Respectfully submitted,

                                     /s/ Max Sarinsky
                                     Max Sarinsky

                                     *Counsel for* Amicus Curiae
                                     *Institute for Policy Integrity*